Argued September 27, 1971, affirmed April 7, petition for
rehearing denied June 22, petition for review
denied November 8, 1972

STATE HIGHWAY COMMISSION, *Respondent
and Cross-Appellant, v.* DeLONG CORPORATION
ET AL, *Appellants and Cross-Respondents.*

495 P2d 1215

554

*Norman E. Bayles* and *Bert B. Rand,* Washington, D. C., argued the cause for appellant and cross-respondent DeLong Corporation. With them on the briefs was George W. Meade, Portland.

*Lamar Tooze,* Portland, argued the cause for appellant and cross-respondent Travelers Indemnity Company. With him on the briefs was Arden E. Shenker and Tooze, Powers, Kerr, Tooze & Peterson, Portland.

*Alan II. Johansen* and *George A. Rhoten,* Special Assistant Attorneys General, Salem, argued the cause for respondent and cross-appellant. With them on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before Schwab, Chief Judge, and Foley and Fort, Judges.

FORT, J.

This declaratory judgment proceeding seeks a determination of the rights and liabilities of the parties arising out of a contract for construction of major components of the Columbia river bridge between Astoria, Oregon, and the state of Washington. The

DeLong Corporation was the contractor and Travelers Indemnity Company the surety on the performance bond. The case was tried to the court without a jury. Following the conclusion of the trial,[1] the court:

(1) Found that plaintiff properly terminated DeLong's contract prior to its completion;

(2) Granted judgment against both defendants for general damages in the amount of $1,719,864.19;

(3) Granted judgment against both defendants in the amount of $952,000, representing liquidated damages accruing on and after the date the contract was canceled by plaintiff;

(4) Dismissed DeLong's counterclaims;

(5) Awarded plaintiff attorneys' fees in the amount of $250,000.

Defendants appeal and plaintiff cross-appeals, each asserting numerous errors.

## SCOPE OF REVIEW

In *Reif v. Botz,* 241 Or 489, 406 P2d 907 (1965), the Supreme Court considered the scope of review on an appeal from a declaratory judgment proceeding. The court said:

"* * * This proceeding being legal in nature, the defendant was entitled to a resolution of the questions of fact as in an action at law. See specially concurring opinion on rehearing in *Oregon Farm Bureau v. Thompson,* 235 Or 162, 199, 378 P2d 563, 384 P2d 182.

"Since the findings of a trial judge sitting as a trier of the facts in an action at law are entitled to the same finality as the verdict of a jury, his find-

---

[1] The trial itself extended for more than six months, producing a transcript in excess of 9,000 pages and over 900 exhibits.

ings must be sustained if there is any evidence in the record to support them. We measure the evidence against this standard." 241 Or at 491.

The defendants cite us to *Consolidated Freight-ways, Inc. v. Flagg,* 180 Or 442, 176 P2d 239, 177 P2d 422 (1947), in support of their contention that we are at liberty in this proceeding to review the record de novo. The most recent pronouncement of our Supreme Court on the issue, decided since the briefs were filed and the argument heard here, is found in *May v. Chicago Insurance Co.,* 260 Or 285, 490 P2d 150 (November 5, 1971), and is as follows:

"As a preliminary matter, we consider the scope of our review. Plaintiffs contend, citing *Consolidated Freightways, Inc. v. Flagg,* 180 Or 442, 176 P2d 239, 177 P2d 422 (1947), that on review of declaratory judgment proceedings this court is not bound by the trial court's findings of fact. Defendants respond that even though this court may not be bound by findings of fact in a declaratory judgment proceeding, it normally accords weight to the circuit court's decision.

"The parties' contentions on this question are applicable only to declaratory judgment proceedings which are basically equitable in nature. The broad language in *Consolidated Freightways* on which plaintiffs rely, 180 Or at 458, is no longer controlling in all declaratory judgment proceedings. It is now clear that such proceedings will be treated as either legal or equitable, depending upon their nature. *Mayer v. First National Bank of Oregon,* 260 Or 119, 133, 489 P2d 385, 392 (September 29, 1971); *Oregon Farm Bureau v. Thompson,* 235 Or 162, 179, 378 P2d 563, 384 P2d 182 (1963). We have treated declaratory judgment proceedings to determine coverage under insurance policies as legal in nature, rather than equitable, with the consequence that the trial court's findings of fact in

such cases are binding on us if supported by any substantial evidence. *Falk v. Sul America Terrestres,* 255 Or 246, 248, 465 P2d 714 (1970) ; *Oregon Farm Bureau v. Thompson,* supra, 235 Or at 199, 200-205 (concurring and dissenting opinions on rehearing, representing the views of five members of the court on this question). See, also, *Reif v. Botz,* 241 Or 489, 406 P2d 907 (1965). We cannot, therefore, accept the parties' invitation to review the evidence in this case de novo. We must accept the trial court's findings of fact if those findings have adequate support in the evidence." 260 Or at 291-92.

■ The complaint and the cross-complaint here are both in the nature of an action to recover damages for breach of contract and as such are legal in nature. Accordingly, in reviewing this case on questions of fact we do so only to determine "if those findings have adequate support in the evidence." *See, also: Oregon Farm Bureau v. Thompson,* 235 Or 162, 176, 378 P2d 563, 384 P2d 182 (1963) ; *Williams v. Stockman's Life Ins.,* 250 Or 160, 441 P2d 608 (1968) ; *Western Bank v. Morrill,* 245 Or 47, 61-62, 420 P2d 119 (1966).

## STATEMENT OF FACTS

The facts established by the evidence and necessary to an understanding of the trial court's findings are as follows: The Astoria bridge was to be constructed across the mouth of the Columbia river by the Oregon State Highway Commission, plaintiff herein, pursuant to agreements between the states of Oregon and Washington. Plaintiff and defendant DeLong, on June 29, 1962, entered into a written contract for the construction of certain piers which were to constitute a major portion of the substructure of that bridge. This contract was preceded by years of ex-

tensive engineering and financial studies by the federal government and both states. Core borings across the proposed alignment of the bridge were made and the detailed results were reported in boring logs and laboratory reports.

On May 19, 1962, the Commission put out for bids its proposal for construction of the substructure of the Astoria bridge. It included detailed drawings, the Oregon State Highway Department's "Standard Specifications for Highway Bridge Construction" and the "Special Provisions for Highway Construction." The proposal called for the construction of 27 concrete river piers and five concrete shore piers. Bids were to be submitted on June 27, 1962.

DeLong assembled a team of engineers to study the available data. They visited the site and talked with a number of special consultants familiar with the project area. Thereafter DeLong submitted its bid, and on June 29, 1962, the Commission approved the award of the contract to DeLong.

The bid proposal required the bidder receiving the award to submit a performance bond prior to the actual execution of the contract. Pursuant to this requirement, DeLong contacted defendant Travelers Indemnity Company, who, after carefully examining the plans, special provisions, bond and contract, executed and delivered to plaintiff on June 29, 1962, a performance bond to secure performance by DeLong of its contract.

The contract was executed on June 29, 1962, and was to be completed in two years. It provided for the following dates of completion:

Unit I:  Piers 170 through 175 and spans over

172, 173 and 174 to be completed by October 31, 1963.

Unit II:   Piers 5 through 12, 160 through 167 to be completed by November 30, 1963.

Unit III:  Piers 168 and 169 to be completed by January 31, 1964.

Unit IV:  Piers 13 through 20 and all other work under the contract to be completed by June 30, 1964.

### Pier 169

It is Pier 169, the largest of all the piers, around which much of the factual controversy in this case centers. This pier was designed to stand upon two seals, the east seal and the west seal. Each one was rectangular, measuring about 45 feet by 90 feet, and was to be placed at or below the river bottom level. The work first involved underwater excavation where each of the pier seals was to be placed. The next step was to drive 528 steel foundation pilings into the river bottom. They were to be equally divided between the two seals. Then came the construction of the coffer-dams. These consisted of interlocking sheets of steel extending around the perimeter of each seal area, in effect making two steel boxes approximately 45 by 90 feet. Next was the pouring of the concrete within the cofferdams. This underwater pour utilized the "tremie" method, a method authorized under the contract.

Generally, the tremie method involves extending one or more pipes to the bottom inside each cofferdam. After a pipe is cleared of water, concrete is poured into a hopper attached to the top of the pipe by a telescoping joint. The initial concrete poured down and

out the open end of the tremie pipe forms a small mound on the bottom. Thereafter the lower end of the pipe is kept imbedded in the concrete. If the pour is continued at the proper rate and pressure and with proper techniques, the "live" pile or piles of concrete continuously expand internally, ultimately filling the cofferdam to the desired elevation. The result is a solid block of concrete, the water having affected only the outside layer. This construction process was undertaken by DeLong, but, for reasons discussed below, the concrete in the seals was found to be defective in January 1964, and controversy arose between the plaintiff and DeLong as to its cause. Basically, each claimed it was the other's fault and duty to absorb the extensive removal and replacement cost.

## Subsurface Information

There were a number of delays both before and after the discovery of the defective seals at Pier 169. By way of defense, the defendants assert that not all of the detailed data available to plaintiff was shown on the contract plans. Thus they contend the problems and delays encountered by DeLong during various phases of construction, and particularly with reference to Pier 169, were due to unanticipated foundation conditions, many of which they claim were known to plaintiff but withheld from defendants.

The trial court found contrary to defendants' assertions regarding the alleged lack of data made available by plaintiff. The court's letter opinion states, *inter alia*:

> "Defendant contends that plans and specifications [supplied by plaintiff], particularly regarding sub surface information, were false and fraudulent and that they were wrongfully induced

to enter into the contract because of said fraudulent misrepresentation. The Court rejects Defendant's claim in this regard, in that Defendant's employees had all the sub surface information that was available to the Plaintiff a considerable amount of time prior to beginning the work, further the Court finds that sub surface information furnished on the plans was a reasonable representation of the difficulties expected to be encountered beneath the surface as construction progressed."

■ There was substantial evidence to support the above conclusion. As the plaintiff points out, the "sheer physical volume of the original boring logs, with associated laboratory reports, etc., testifies eloquently as to why all this data was not reproduced on the plans." Furthermore, after examining the contract plans and summary of the boring logs, Mr. Arthur Elliott, bridge engineer for the California Division of Highways, testified that the information thereon would alert a contractor to the general condition prevailing across the mouth of the Columbia river. He testified:

"* * * [O]bviously [Exhibit 36, a summary of parts of the information in the boring logs available to DeLong] doesn't contain all the information that is contained from the boring logs, but outside of a few minor discrepancies, or not even discrepancies, differences, it conveys, I think, a correct and reasonable impression of what the bar across the mouth of the Columbia looks like, and I think that it as such, would convey to a contractor a fair representation of what he might be expected to encounter in the construction of this bridge."

More importantly, however, before submitting their bids, all bidders, including DeLong, were advised that further information on the project could be obtained from the division engineer in Salem or the

resident bridge engineer in Astoria. The name and address of each was furnished. Mr. George Taite, the leader of the team formulating DeLong's bid, although aware of their existence, made no effort to obtain the original boring logs.

In accepting the contract, DeLong warranted that it

"* * * has made a careful examination of the plans, specifications, and contract; that he has fully informed himself as to the quality and quantity of materials and the character of the work required; and that he has made a careful examination of the location and condition of the work and the sources of supply for materials."

Article 2.1.1 of the proposal provided:

"The subsurface material at the site, as shown on the plans, represents the best available estimate of the existing conditions based on explorations made by the Highway Commission. The Highway Commission does not guarantee that material encountered will conform to that shown on the plans."

### Pile Driving

There was much testimony relating to DeLong's experiences in driving the foundation piling. Despite defendants' numerous assertions to the contrary, it is sufficient here to say we find that there was substantial evidence to support the trial judge's conclusion

"* * * that the extensive testimony and much ado made, regarding sub surface conditions was a make-weight argument by the Defendant in this case in order to divert attention from the real problem that led to the termination of the contract; that is, the final responsibility for the pouring of the bad concrete seals at Pier 169, particularly in light of the fact that all the piling necessary for completion of this project had been driven with no more difficulty, than should have been anticipated

while driving piling in the estuary of this great river."

*Scour*

An additional area of dispute around which much controversy centered concerned the development of "scour" around the cofferdams at Pier 169. The court points out:

"Defendant makes much of the scour problem which occurred at Pier 169 and the subsequent events relating thereto, although the protection of the cofferdams at Pier 169, under the contract, was basically the responsibility of the Defendant. Plaintiff, for reasons of its own, undertook to abate this scour condition and did stabilize the bottom of the river by use of fascines and large quantities of rock. This necessitated the re-driving of a cofferdam and adjustment of the lower level of the concrete seals before pouring could commence."

It appears from the evidence that the condition known as scour frequently occurs when an obstacle, such as a bridge foundation, is placed in a river. The obstruction changes the flow of water in that vicinity, which in turn affects the existing stability of the river bed material. Where this occurs, the bottom material is carried away, similar to the effects of erosion on land, leaving holes in the river bed in and around the obstruction.

In designing bridge foundations, one of the foremost considerations is the determination of probable scour, for, if the foundations are designed without due regard for that contingency, the foundations may be undermined, causing the bridge to collapse. Thus, the foundations must be placed sufficiently deep into the river bed to safeguard against the effects of scour.

It is not disputed that severe scouring occurred at Pier 169, and that extensive corrective measures were undertaken at the state's expense. On the morning of September 16, 1963, scour was detected in the area of the recently completed upstream cofferdam. The scour situation progressively worsened and, on September 19, the state sent to Astoria Mr. Glen Paxson, who at the time was one of its special engineering consultants. At the state's insistence, appropriate measures were taken to arrest the scour and build the river bed back to a satisfactory level.

Mr. Hans Wendel, who was DeLong's chief engineer, testified that he anticipated there would be some scour in the area of Pier 169. Furthermore, an Army Corps of Engineers report concerning conditions relevant to scour potential at the mouth of the Columbia river was available to DeLong as a public document.

Pursuant to the provisions of the contract, DeLong's cofferdam plans were submitted to the state and, after certain suggested revisions, were approved subject to the terms of the contract imposing upon the contractor responsibility for the "successful use and safety" of the cofferdam design details. By the terms of the contract, DeLong also agreed that:

> "Until final acceptance of the contract the contractor shall be held responsible for any injury or damage to the work or to any part thereof by the action of the elements, or from any cause whatsoever, and he shall make good at his own expense all injuries or damages to any portion of the work before its completion and final acceptance.
>
> "* * * * *
>
> "The contractor shall accept the compensation, as herein provided in full payment for furnishing all materials, labor, tools and equipment, and for

performing all work under the contract, also for all loss, damage, or liability arising from the nature of the work, or from the action of the elements, or from any unforeseen difficulties which may be encountered during the prosecution of the work until its final acceptance by the Commission."

## Causes of Bad Concrete

■ The defendants argue in part that the scour condition was somehow related to the cause of the poor concrete at Pier 169. The court expressly rejected this theory, stating:

"Defendant attempted to relate the scour condition to the ultimate failure of the concrete poured into the two cofferdams constructed at Pier 169, this concrete was to be the seals atop the piling driven at this site, which in turn formed the base for one of the main piers supporting the span across the main river channel.

"The Court rejects the Defendant's theory and accepts the testimony of Plaintiff's experts, relating to the cause of the poor concrete at Pier 169, the basic causes being a slow rate of pour, the failure to use more than one tremie pipe during the period of the pours, and the failure to maintain a tremie pipe in such condition as to exclude excess water during the time of the pour. These factors allowed the concrete to segregate and bulk, which in turn accounted for the underruns experienced at Pier 169. The pouring of a good seal, of course, was the Defendant's responsibility under the contract, and once it was discovered that the seals were bad, it was the defendant's responsibility to remove and replace said concrete with an acceptable work product. This the Defendant failed and refused to do, and this was adequate grounds for Plaintiff to cancel the Defendant's contract, and acting in the public interest, to proceed with another contractor, for the completion of the substructure work."

In the case of both the upstream and downstream seals, there was found, upon completion of the pours, to be underruns of concrete of about 1,000 cubic yards; that is, each seal with a theoretical volume of 3,000 cubic yards was filled by only 2,000 cubic yards of concrete. The cofferdams were dewatered in late December 1963, and the state completed on January 9, 1964, a coring program on the seals which showed that quantities of river sand were present in the seals and considerable segregation existed between the aggregate and the cement. Both of these conditions were in violation of the Standard Specifications.

Defendants' theory at the trial was that vast quantities of stream bed material somehow worked their way under, over or through the steel cofferdams and into the seal area. These "adverse hydraulic conditions," the defendants asserted, "at least partially" were responsible for the defective pours at Pier 169.

In refuting defendants' theory, the plaintiff called Mr. Glen Paxson, a highly qualified former deputy state highway engineer with over 40 years' experience in bridge construction. He testified that, in his opinion, the underrun in the seal concrete was not caused by the intrusion of materials from outside the cofferdam. Basically, this was because the only way for sand or other stream bed material to get into the seal area was down the outside of the cofferdam piles, under the tips, and up the inside of the cofferdams. Neither the minimal difference in hydraulic "head" nor any differences between the weight of materials inside and those outside the cofferdam was sufficient to have forced sand underneath the sheet piles. "The probability of such a thing happening is so remote that it can be considered as impossible." This con-

clusion was supported by the testimony of other competent experts called on behalf of the state.

Both seals at Pier 169 were poured through a single tremie pipe. In contrast, the evidence indicated that the seals of comparable size at Pier 170 were poured with at least two and perhaps four tremie pipes. A number of well qualified experts testified on behalf of the state regarding the necessary number of tremie pipes for a pour of the magnitude at Pier 169; each opinion varied somewhat as to how many tremie pipes should properly have been used, but all agreed that one tremie pipe was clearly not enough.

The rate of pour at Pier 169, found by the court to be too slow, averaged 25 to 30 yards per hour at the two seals. The evidence indicated that at the time the contract was awarded the DeLong management contemplated a maximum rate of pour of tremie concrete in the seals of about 70 to 100 yards per hour, and on January 22, 1964, after it was discovered that the seals were defective, DeLong itself acknowledged that the rate of pour at Pier 169 had been about 25 or 29 yards per hour, and that on future tremie pours it should be about 80 yards per hour. In addition to this evidence, there was substantial expert testimony from witnesses that the slow rate of pour was one of the significant factors in producing the defective material in the seals at Pier 169.

Article 2.4.9 of the contract states, *inter alia,* "Concrete shall be placed so as to avoid segregation of the materials." The same section further requires that "[As] far as practicable, the pipes shall be kept full of concrete during placing and their lower ends shall be kept buried in the newly placed concrete."

■ Upon discovery of the condition of the seals at

Pier 169, the Commission determined they were un-acceptable, and DeLong was advised on January 9 that it would be required to replace the seals at its expense. The last work at Pier 169 was on or about January 16, 1964; pumps were removed by DeLong on January 24 and never returned there. There followed a series of meetings between DeLong and Commission officials.

Following extensive discussions, DeLong, on February 18, 1964, filed in the United States District Court for the District of Oregon a complaint for Declaratory Judgment and injunctive relief against the Oregon State Highway Commission seeking "to terminate the contract between it and defendant Oregon State Highway Commission and to be excused from further performance thereof" and also seeking "compensatory and consequential damages from the defendant Oregon State Highway Commission because of the material breaches thereof by defendant Oregon State Highway Commission."[2]

Toward the end of the week ending February 22, 1964, Mr. Hans Wendel, DeLong's chief engineer, told plaintiff that because the job was in litigation in federal court, DeLong would not be working at any location other than where it was working that week. Work that week did not include any work on Pier 169. Mr. Wendel left the job in late February 1964, and never returned except to pack up and move to New York. The last entry in his diary was on February 21, 1964. DeLong's pile-driving and work barges were permanently removed from the job on about February 27, 1964.

---

[2] This case was subsequently dismissed on the ground of lack of jurisdiction. DeLong Corporation v. Oregon State Highway Com'n, 233 F Supp 7 (D Or 1964), *affirmed* 343 F2d 911 (9th Cir), *cert denied* 382 US 877, 86 S Ct 161, 15 L Ed 2d 119 (1965).

On March 31, 1964, the state highway engineer certified to the Commission that sufficient cause existed for termination of the contract in that the contractor had violated its provisions in several material respects, including substantial abandonment, as shown by recent, nearly total inactivity, persistent, repeated failure to supply enough workmen for efficient prosecution of the work, failure to correct and replace defective work, persistent disregard of the engineer's instructions to proceed, inability or unwillingness to proceed according to the terms of the contract, as shown in its allegations in the federal court complaint, failure to vigorously prosecute the work, failure to complete Units 1, 2 and 3, and inability to complete Unit 4 by the respective completion dates therefor.

Based thereon, the Commission authorized the termination of the contract. The letter of termination was sent to DeLong and to Travelers Indemnity Company on April 2, 1964.[9] By the terms of the letter, the effective termination date was April 13, 1964. Thereafter the Commission evaluated the work done by DeLong under the contract, determined what remained to be done thereunder and revised the plans and specifications accordingly. On June 24, 1964, the Commission put out for bids its revised proposal for completion of the unfinished work called for by the DeLong contract. Following competitive bidding, a contract

[9] The parties had agreed, under the terms of the contract, that, upon the engineer's certificate that sufficient cause existed, the Commission could terminate the contractor's employment for various reasons, including persistent or repeated refusal to supply enough workmen for efficient prosecution of the work, persistent disregard of the engineer's instructions, or other substantial violation of any provision of the contract. It was further agreed that, in addition, the Commission could cancel the contract for any willful failure or refusal of the contractor to faithfully perform the contract according to its terms and conditions.

was awarded on July 13, 1964, to Raymond International, Inc. The Raymond contract was completed on August 2, 1965, 476 days after the effective date of termination.

We hold that the trial court's finding that the contract was breached by DeLong and validly terminated by the plaintiff effective April 13, 1964, was amply supported by the evidence. We turn now to the remaining issues.

## LIQUIDATED DAMAGES

The special provisions of the contract relating to Prosecution and Progress include the following:

> *"Time for Completion of Work
> and Liquidated Damages:*
>
> "Time is of the essence of the contract. The schedule of completion dates set forth in the special provisions titled 'Dates of Completion' are necessary for the orderly completion of the project. Inasmuch as any delay in the prosecution of the work will inconvenience and be expensive to the traveling public, obstruct traffic, interfere with and delay business and commerce, and increase the cost to the State, it is essential that the work be pressed vigorously to completion.
>
> "The contractor shall complete the work called for under the contract in all parts, units and requirements on the calendar dates specified in an accompanying special provision.
>
> "It is agreed by the parties to the contract that in case all the work called for under the contract in each and all parts, units and requirements is not finished or completed on the calendar dates called for in the contract, damage will be sustained by the State of Oregon, and that it is and will be

impracticable and extremely difficult to ascertain and determine the actual damage which the State will sustain in the event of and by reason of such delays; and it is therefore agreed that the contractor will pay to the State of Oregon as liquidated damages or the State, at its option, may deduct from any moneys due or to become due to the contractor from the State, the sum indicated in the schedule below for each and every calendar day elapsed beyond the calendar date specified for the performance and completion of the work called for in the contract.

*"Schedule of Liquidated Damages*

| "Unit of Work | Per Calendar Day Liquidated Damages |
|---|---|
| Any one unit | $2000.00 |
| Any combination of one or more units | 2000.00 |

"Liquidated damages will be assessed against the unit or combination of any one or more unites [sic], as listed under 'Dates of Completion', having the longest overrun of time in calendar days over the specified completion time.

"* * * * *

"Payment of liquidated damages shall not release the contractor from obligations in respect to the fulfillment of the entire contract, nor shall the payment of such liquidated damages constitute a waiver of the State's right to collect any additional damages which it may sustain by failure of the contractor to carry out the terms of his contract, it being the intention of the parties that said liquidated damages be full and complete payment only for failure of the contractor to complete the work on time."

Concerning liquidated damages the court found:

"Claims had been made for liquidated damages and for damages by the parties up to the time of

the cancellation of the contract. The Court hereby finds that there were offsetting, valid delays, occasioned by both parties up until the termination time.

"* * * * *

"However, the Plaintiff is entitled to an additional amount other than stated above, in the form of liquidated damages, occasioned by the delay caused by the Defendant, for a period of 476 days at $2,000.00 per day, or the amount of $952,000.00."

Defendants, in their ninth assignment of error, challenged the above award of liquidated damages for delay, and plaintiff in its first assignment of error on cross-appeal challenges the failure of the trial court to award it liquidated damages for delays occurring prior to its termination of the contract in the further amount of $330,000. The court found that there were "offsetting, valid delays, occasioned by both parties up until the termination time" and thus denied liquidated damages for delays prior to termination.[4]

■ We consider first whether plaintiff was entitled to the liquidated damage award for the delay in the completion of work following its termination of the DeLong contract by the state. We recognize initially

---

[4] In its cross-appeal the state also contends, alternatively to its claim for liquidated damages, that its actual damage resulting only from the delay in completion was $1,393,341.24. In its cross-complaint the state alleged that during the 15-month delay it sustained the following losses:

"Loss on Ferry Operations (Schedule A-4)    $435,283.24

Loss on Bridge Toll Operations (Net)    708,058.00

Loss of Washington State Subsidy    250,000.00"

Evidence was received in support of each. The trial court, however, by reason of its finding of "offsetting, valid delays," found it unnecessary to determine what, if any, of the claimed actual losses from delay were established. The state concedes that it is entitled only to one or the other.

that in law a provision of a contract is not converted from a penalty to liquidated damages simply by so denominating it.

Restatement, Contracts 552-53, § 339 (1932), states in part:

"(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

"(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

"(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

"* * * * *

"Comment on Subsection (1):

"* * * * *

"c. Where the amount of loss or harm that has been caused by a breach is uncertain and difficult of estimation in money, experience has shown that the estimate of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves. Further, the enforcement of such agreements saves the time of courts, juries, parties, and witnesses and reduces the expense of litigation. In such cases, if it is not shown that the principle of compensation has been disregarded, the liquidation by the parties is made effective.

"* * * * *."

In *Secord v. Portland Shopping News,* 126 Or 218, 223-25, 269 P 228 (1928), the court, after discussing the considerations determinative of the difference between a liquidated damage provision and a penalty, said:

"* * * In determining whether any particular

stipulation is to be regarded as one fixing a penalty, or whether it really liquidates the damages, the adjudicated cases present us with an abundance of rules to guide our determination. For instance, the situation must be appraised as of the time when the contract was effected, and not as it appears at some other time: *Baltimore Bridge Co. v. United R. etc. Co.*, 125 Md. 208 (93 Atl. 420). It is well settled that in the determination of the problem the court should consider all of the circumstances which surrounded the parties, together with the ease or difficulty of measuring the breach in damages. A comparison of the size of the stipulated sum not only with the value of the subject matter of the contracts, but also with the probable consequences of the breach as they appeared when the contract was executed may be helpful: 17 C. J., Damages, § 234. Mr. Justice BEAN in *Salem v. Anson*, 40 Or. 339 (67 Pac. 190, 91 Am. St. Rep. 485, 56 L. R. A. 169), well states another helpful rule in language which has been much quoted:

" '* * * When the actual damages in case of a breach of the contract must necessarily be speculative, uncertain, and incapable of definite ascertainment, the stipulated sum will be regarded as liquidated damages, and may be recovered as such without proof of actual damages, unless the language of the contract shows, or the circumstances under which it was made indicate, a contrary intention of the parties, or it so manifestly exceeds the actual injury suffered as to be unconscionable * * * Where the damages are uncertain and speculative, the presumption ordinarily is that the parties have taken that into consideration in making the contract, and have agreed upon a definite sum to be paid in case of a breach, in order to put the question beyond dispute and controversy and to avoid the difficulty of proving actual damages.'

"* * * * *

"It is also to be noticed that some of the former

antipathy to these provisions which inclined courts at times, to construe them as stipulations for a penalty is modulating. Thus Mr. Justice CLARKE on behalf of the federal Supreme Court in *Wise v. United States*, 249 U.S. 361 (63 L. Ed. 647, 39 Sup. Ct. Rep. 303), expressed the changed attitude thus:

" 'The later rule, however, is to look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts often involve difficulty, uncertainty, delay and expense.' "

In *Priebe & Sons v. United States*, 332 US 407, 411-12, 68 S Ct 123, 92 L Ed 32 (1947), the United States Supreme Court said:

"Today the law does not look with disfavor upon 'liquidated damages' provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. [Citations omitted.] They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. [Citations omitted.] And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. [Citation omitted.]"

*See also*, 5 Corbin, Contracts 402, 407-09, § 1072 (1964); 5 Williston, Contracts 733-36, § 785 (3d ed 1961); 35 Ill L Rev 74 (1941); 52 Harv L Rev 160 (1939).

■ Here the difficulty inherent in determining and proving actual damages for delay prior to completion

of the bridge is apparent,[9] as for example in determining the net loss of revenue which would have been derived had the bridge been in operation. This is particularly true when the validity of the liquidated damage provision must be determined as of the time the contract was entered into, rather than at the time of completion. *Secord v. Portland Shopping News,* supra; *Priebe & Sons v. United States,* supra. That the amount of liquidated damages claimed does not unconscionably exceed the actual injury suffered is seen from the testimony relating to the claimed losses from the ferry operation, absence of toll revenues, and deprivation of the Washington state subsidy.

We think it clear that the challenged provision was correctly viewed as one for liquidated damages, and not as a penalty, "amercement" or forfeiture.

■ The defendants rely primarily on the case of *Rainier v. Masters,* 79 Or 534, 154 P 426, 155 P 1197, 1916E LRA 1175 (1916), in support of their contention that no liquidated damages can be here allowed. In *Rainier,* the city of Rainier brought an action against the contractor and surety on a bond to secure performance of a sewer construction contract that stipulated if the required work was not completed by September 14, 1909, the defendants would pay liquidated damages of $10 per day for each day beyond the date specified for completion. These liquidated damages were to run from the date of required completion to the date of actual completion. The complaint alleged that the contractor began performance, but the contract was never completed. At the time of the trial the city had taken no steps toward completion of the project, although more than four years

---

[9] See n 4.

had passed since work had ceased upon it. The city sought as its sole claim for damages the enforcement of the $10 per day clause. In rejecting this contention the court said:

"The complaint declares an *abandonment of the contract* after the commencement of performance. At what stage of the work this occurred is not stated. The effort of the plaintiff is to apply to such a breach the stipulation for the allowance of $10 a day for delay in completing the undertaking. We note that by the provisions of the agreement itself this *per diem* forfeit is not to be applied for an indefinite period in the discretion of the plaintiff. *On the contrary, the stipulation is limited to time 'which should elapse after the expired time to date of completion.'* In other words, the term for which the amercement is to be allowed is bounded in the beginning by September 15, 1909, and is ended at the completion of the improvement. The pleading fails to disclose such latter date. Indeed, the plaintiff virtually states that there is no such date in that it says the enterprise was never finished. The manifest intention of the parties was, not to apply this clause to general damages, but only to mere delay. The stipulation on that point contemplates a fulfillment of the contract although belated, and not a breach by abandonment. * * *

"* * * * *

"* * * It was not the intention of the parties, as manifested by their agreement, to create a perpetuity of *per diem* forfeiture bounded only by the statute of limitations or the rapacity of the plaintiff. In general, damages are limited to compensation to the end that the injured party may be made whole, and it is only where it is difficult or impossible to calculate the actual damage that the previous stipulation of the parties for liquidated damages will be enforced. * * * The complaint does not portray any condition to which the drastic

remedy of liquidated damages is applicable. *It was at least the duty of the pleader to show a completion of the contract, and thus establish the termination of the period of forfeiture.* Failing to do so, he has not stated in any event a breach to which can be applied the measure of damages he invokes. * * *" (Emphasis supplied.) 79 Or at 537-39.

Here, however, unlike *Rainier,* the plaintiff did proceed to complete the work required under the DeLong contract. Promptly after its termination of the contract, the state, following preparation of the necessary documents, called for bids to complete the work called for in the DeLong contract, and on July 13, 1964, awarded the contract to Raymond International, Inc., for $2,434,926.69. The court's award of general damages in the amount of $1,719,864.19 reflects its findings of the difference between the Delong contract price and the actual cost to the state of completing the agreed work, with certain adjustments not here relevant.

In *Rainier,* the complaint alleged "an abandonment[⊙] of the contract." Here, however, not only was the completion of the work, though by a different contractor, alleged and proved, but extensive evidence received concerning the actual losses of the plaintiff incurred therein, exclusive of the challenged liquidated damages.

Furthermore, in *Rainier* it is obvious that the court concluded the city had also abandoned the

---

[⊙] 5 Williston, Contracts 733, 734, § 785 (3d ed 1961):

"If the contract is abandoned, the agreed damages are, of course, not recoverable, since mutual abandonment of the contract is tantamount to a tacit recision. In speaking of abandonment, however, courts sometimes use the words 'abandoned the contract' when in reality they mean that the contractor has abandoned work on the project."

project,[7] the exact opposite of the situation here, for it said:

"* * * It was not the intention of the parties, as manifested by their agreement, to create a perpetuity of *per diem* forfeiture bounded only by the statute of limitations or the rapacity of the plaintiff. * * *" 79 Or at 539.

Here the intention of the parties as set forth in the contract was not only that the project be completed promptly as it was, but that the provision for liquidated damages was inserted to compensate only for delay in that completion.[8]

In Comment, *Applicability of Liquidated Damages Clause to Delays Where Building Contractor Abandons,* 35 Ill L Rev 74, 76 (1941), the writer points out:

"Satisfaction of the fundamental purpose of the liquidated damages clause requires in all kinds of delay a construction of the clause to allow recovery according to the stipulated rate, since all delays operate to defeat the interest of the owner in attaining a timely completion. Holding the clause inapplicable to delays in case of abandonment results in giving the contractor an opportunity to

---

[7] See Comment, *Applicability of Liquidated Damages Clause to Delays Where Building Contractor Abandons,* 35 Ill L Rev 74, 76, n 9 (1941):

"City of Rainier v. Masters, 79 Ore. 534, 154 Pac. 426 (1916) (damages for delay denied, the owner having taken no steps toward completion at the time of trial which was four years after the abandonment); Moses v. Antuono, 56 Fla. 499, 47 So. 926 (1908); Mason v. Consolidated Co., 99 Okla., 32, 225 Pac. 381 (1924). * * * Courts properly have refused to permit recovery for delay when the construction is never completed but it does not follow that the clauses should not be applied where the work ultimately is completed within a reasonable time. In the latter instance the exact amount of delay can be measured and the possibility of the contractor's *ad infinitum* liability is removed."

[8] See provisions of contract, supra.

avoid his contractual obligations. Such a view not only denies recovery for delays which would appear were the contractor to complete, but even denies recovery for delays which have 'accrued' between the date set for completion and the date of abandonment. Whenever the contractor can foresee his inability to complete on time or when he has passed the completion date, he may determine that his probable liability for delay plus the out-of-pocket expense to himself of completing will equal or exceed the cost of getting the project completed by another. It will then be unprofitable for him to continue and he may abandon the job. * * *"

We believe that the trial court correctly concluded since this project was completed without unreasonable or unnecessary delay that there was not only no abandonment within the rule announced in *Rainier,* but rather that its correct application to the facts here is fully consistent with the *Rainier* holding.

In *May v. Chicago Insurance Co.,* supra, the court said:

"As a general rule, the construction of a contract is a question for the court and is treated as a matter of law. * * * In *Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960), we said:

" 'If the provisions of the contract are plain and unambiguous, it is the function of the court to interpret the contract and declare its legal effect. (Citing cases.)

" 'If the language of the contract is ambiguous, or if technical words, terms of art, or local phrases are used, evidence showing the meaning or interpretation of the contract may be admitted. In such event, the jury should determine the intention of the parties. (Citing cases.)' " 260 Or at 292-93.

The provisions of the contract relating to liquidated damages were in our view plain and unambiguous. But whether so viewed, since the trial judge sat here as the trier of fact as well as the determiner of law, we conclude that he correctly determined that the liquidated damages provision was here applicable. Since his finding that the defendants were chargeable with delay aggregating 476 calendar days is supported by substantial evidence, his award of $952,000 as liquidated damages for that delay is affirmed.

■ In plaintiff's cross-appeal it asserts the trial court erred in not awarding it liquidated damages for the period between breach and termination. The trial court found that there were "offsetting, valid delays" during this period and concluded that plaintiff was not entitled to liquidated damages for the 165 days claimed as elapsing between breach and termination. It is sufficient without more to point out that plaintiff authorized additional work orders to correct problems resulting from scour for which it agreed to pay DeLong more than $200,000 in excess of the contract price. We think the trial court's denial of the cross-appeal is supported by substantial evidence.

## ATTORNEY FEES

Defendants, in their 12th and 13th assignments of error, assert that the trial court improperly allowed $250,000 in attorneys' fees to plaintiff against the defendant Travelers Indemnity Company.

■ The general rule is that attorney fees are not recoverable except pursuant to a contract, express or implied, or unless provided for by statute. *State v. Jamison*, 251 Or 114, 120, 444 P2d 15, 444 P2d 1005

(1968); *State Land Board v. Sovenko,* 202 Or 571, 574, 277 P2d 781 (1954); *Garrett v. Hunt,* 117 Or 673, 244 P 82, 245 P 321 (1926). Here neither the contract nor the performance bond expressly refers to attorney fees. The parties agree that the plaintiff's right, if any, to attorney fees depends upon ORS 743.114 (1):

> "If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, then the plaintiff shall recover as part of his judgment such additional sum as the court may adjudge to be reasonable as attorney fees."

The policy behind this statute, as explained in *Heis v. Allstate Insurance Co.,* 248 Or 636, 436 P2d 550 (1968), is

> "* * * to encourage the settlement of claims and to discourage the unreasonable rejection of claims by insurers. If the insurer, in rejecting a claim or in tendering less than is claimed, relies upon a mistaken theory of its legal liability, the plaintiff is entitled to a reasonable attorney's fee if he recovers more than the tender." 248 Or at 643-44.

In *State v. Claypool,* 145 Or 615, 28 P2d 882 (1934), the court, in holding that the filing of the complaint was itself a sufficient demand where the contract did not require that a formal proof of loss be filed under ORS 743.114, stated:

> "Defendant contends that the allowance to the state of attorney's fees was improper. Section 46-134, Oregon Code 1930, authorizes the allowance of attorney's fees upon all policies of insurance if settlement is not made within six months after date that proof of loss is filed with the company. It

further provides that, if the defendant tenders any amount into court and no greater amount is recovered in the action, then attorney's fees shall not be allowed. There was no tender made and there is no provision in the policy requiring proof of loss as in ordinary fire insurance cases. The commencement of the action is equivalent to demand for payment, whether previously made or not and this we think renders the statute applicable and entitles the plaintiff to attorney's fees in this action. The complaint was filed on April 11, 1932, but the judgment was not entered until June 7, 1933, more than six months after the commencement of this action. This, we think, brought the case within the intendment of the statute under the doctrine followed and approved in *Murray v. Firemen's Ins. Co.*, 121 Or. 165 (254 P. 817); *Goodspeed v. Duby*, 131 Or. 275 (283 P. 6); *School Dist. v. New Amsterdam Cas. Co.*, 132 Or. 673 (288 P. 196); *Dolan v. Continental Cas. Co.*, 133 Or 252 (289 P. 1057)." 145 Or at 621-22.

*See also, New York Life Insurance Company v. Lee,* 232 F2d 811 (9th Cir 1956).

■ As this action is by plaintiff to, *inter alia,* recover on an indemnity insurance policy issued by defendant Travelers, its declaratory nature does not prevent ORS 743.114 from becoming operative. *Williams v. Stockman's Life Ins.,* 250 Or 160, 172, 441 P2d 608 (1968); *cf. Hollopeter v. Oreg. Mutual Ins.,* 255 Or 73, 464 P2d 316 (1970); *First National Bank v. Malady,* 242 Or 353, 360, 408 P2d 724 (1966).

■ The complaint alleges:

"Plaintiff afforded to Travelers, as surety for DeLong, ample and reasonable opportunity to complete the work remaining to be done after said Contract No. 6124 was terminated, but Travelers for more than six months prior to the filing of this suit failed to do so. That plaintiff is entitled to

recover $250,000.00, all of which is reasonable, as attorney fees from the defendant Travelers."

We hold that plaintiff sufficiently pleaded its right to recover attorney fees from Travelers pursuant to ORS 743.114. *See, Staff Jennings, Inc. v. Fireman's Fund Insurance Company*, 218 F Supp 112, 114 (D Or 1962). Additionally we note that plaintiff addressed the notice of termination of April 2, 1964, to DeLong and to Travelers jointly. The notice included the statement:

"This is to further advise that the State will henceforth look to Traveler's Indemnity Company for completion of the contract according to its terms, in accordance with its obligations as surety. If said surety fails to promptly undertake the satisfactory completion of the work, the State will do so, either by means of its own forces or by contract, as the Commission may deem appropriate. In any event, the State will look to the DeLong Corporation and Traveler's Indemnity Company for recovery of the damages sustained by the State by reason of the contractor's violation of the provisions of the contract."

Thus, we hold that Travelers had full knowledge of plaintiff's intention to hold it liable for performance of the contract including damages, and that the complaint itself constituted a sufficient proof of loss within ORS 743.114 (1).

Defendant Travelers contends that since there is no specific amount sought in plaintiff's prayer for relief, Travelers was unable to know how much to tender to plaintiff, and thus plaintiff should not be permitted to avail itself of ORS 743.114 by way of the rule laid down in *Claypool*. This argument is without merit, as paragraphs XI, XII and XIII of this com-

plaint all set forth specific amounts of money damages alleged to be owing to plaintiff because of DeLong's breach of contract. There are no provisions in the statutes or in Travelers' bond relating to the specificity with which the plaintiff must set forth its proof of loss. Travelers was entitled to sufficient information to form a reasonable estimate of its liability. The complaint sufficiently advised Travelers of the amounts claimed for breach of the contract.

In *Heis v. Allstate Insurance Co.*, 248 Or 636, 644-45, 436 P2d 550 (1968), the court said:

"* * * There are no provisions in the statutes or in the insurance contract relating to the specificity with which the insured must set forth his proof of loss. The insurer is entitled to sufficient information to form a reasonable estimate of its liability. This does not mean that the insured's claim is barred if the proof of loss originally filed does not contain sufficient information to make this estimate. If the proof of loss is ambiguous, the insurer should make a reasonable effort to resolve the ambiguity. Defendant's own policy indicates that it may be necessary for it to investigate a claim for the purpose of testing its validity. Thus, the policy provides that the insured 'shall after such request from Allstate execute authorization to enable it to obtain medical reports and copies of records.'

"If defendant's contention is that plaintiff's proof of loss was so uncertain that defendant was unable to determine the character of plaintiff's claim, then defendant should have requested plaintiff to make her claim more definite and certain. If defendant's contention is that the expenses incurred were adequately described in the proof of loss but inadequately segregated then, as we have explained above, defendant was mistaken, as was the trial court, with respect to its liability, and

consequently the proof of loss was not inadequate since it presented a claim which entitled plaintiff to recover."

Furthermore, Travelers does not here contend that it at any time tendered to plaintiff any amount whatsoever in response to the allegations of the complaint.

■ Accordingly we conclude as more than six months passed between the commencement of this action and final judgment, the plaintiff is entitled to recover reasonable attorney fees from defendant Travelers. *State v. Claypool,* supra, 145 Or at 622.

■ Since there was no contractual or statutory authority permitting recovery of reasonable attorney fees from defendant DeLong, none are recoverable. *State v. Jamison,* supra. We find no difficulty in the fact that, as a consequence of differing liabilities regarding attorney fees, the two defendants are obligated to plaintiff in different amounts. *Esselstyn v. Casteel,* 205 Or 344, 369-70, 286 P2d 665, 288 P2d 214, 288 P2d 215 (1955). The assignments of error do not challenge the amount of the award for attorney fees. We do not therefore consider it.

## REMAINING ASSIGNMENTS OF ERROR

Assignments of error two through five encompass challenges to the accuracy of approximately 50 evidentiary rulings. The second assignment challenges the court's denial of a motion to strike certain testimony of Glen S. Paxson. Mr. Paxson, a registered civil engineer, was employed by the plaintiff for over 43 years. He served in steadily advancing capacities including that of state bridge engineer until in 1961 he became the deputy state highway engineer, which position he occupied during the time this contract was

entered into. He retired January 1, 1963, and thereafter served the plaintiff in an advisory capacity in part in connection with the Astoria bridge. Assignment of error three, part seven, challenges the admissibility of Exhibits 400 and 403. Since the former depends in part upon the latter, we consider them together.

During the trial Robert Pool testified on behalf of the state. He was a registered professional engineer employed by plaintiff as an assistant resident engineer at the job site throughout the project. He was present as the representative of the project engineer, Mr. Ellison, during both the pouring and the dewatering of the seals at Pier 169. Exhibits 400 and 403 were identified and introduced during his testimony. These exhibits were intended to reflect the slope of the concrete as it was being poured within both the upstream and downstream seals at Pier 169. Attached to each exhibit was a series of sheets reflecting the changing elevations of the concrete as it was poured. These measurements were made periodically by a team of four engineers throughout each pour. Two of these men were employed by DeLong and two by plaintiff. Mr. Pool actually participated in the process.

The two exhibits in effect were profiles of the seal pours at Pier 169. From the periodic recordings thus obtained and attached as back up for each exhibit, there was prepared a summary of the recorded data in the form of a profile extending the recorded data to show as accurately as was reasonably possible the progress of the concrete pour taking place more than 50 feet below the surface of a rapidly flowing, great and murky river.

The defendants objected during Mr. Pool's testimony to the admission of Exhibits 400 and 403 on grounds of "materiality and relevance," but stipulated as to their authenticity. At that time counsel stated:

"* * * I will stipulate now I have no objections to the authenticity.

"* * * * *

"MR. RHOTEN [counsel for plaintiff]: I expect them to show the contours of the concrete at various times during the course of the pier—the course of pouring the seals.

"MR. RAND [counsel for DeLong]: Your Honor, if Mr. Paxson testifies to such a thing, and he is a proper witness to so testify, and he testified he had something to do with it, and then these are offered, they might fit in the context of his testimony. A foundation may be laid for it, and they might be connected up."

Subsequently, Mr. Paxson, over objection, testified, based in part upon Exhibits 400 and 403, that the seals at Pier 169 were defective. In expressing his opinion concerning why those seals were defective, Mr. Paxson relied in part upon those exhibits. This constitutes the chief basis of defendant's claim that the testimony of Mr. Paxson should have been stricken.

At the conclusion of plaintiff's case-in-chief, defendants moved to strike Exhibits 400 and 403 as "irrelevant and immaterial" and "in no way connected with the issues in plaintiff's case in chief." The motion also sought to strike Mr. Paxson's testimony because he considered Exhibits 400 and 403 in arriving at his conclusions concerning the seals. Both motions were denied.

The rulings were correct. The challenged ex-

hibits were relevant to the establishment of the rate of pour of the seals and to compliance by DeLong with the provisions of the contract concerning the pouring of the seals. The exhibits were properly identified and were made by qualified personnel of both parties acting together in the regular course of the work at or about the time of the conditions noted. The court correctly concluded that the sources of information, method and time of preparation justified their admission. ORS 41.690.

We note that a number of the asserted errors, as in Exhibits 400 and 403, involve the introduction into evidence of summaries made from other writings, records or documents. It is difficult to imagine any case where summaries or other graphic representations of relevant material would be of greater aid to the court than in the case at bar, involving as it did an immense volume of both oral and documentary evidence. ORS 41.640 (1)(e) provides:

> "There shall be no evidence of the contents of a writing, other than the writing itself, except:
>
> "* * * * *
>
> "(e) When the originals consist of numerous accounts, or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

In Note and Comment, *Evidence—Best Evidence Rule—The Law in Oregon,* 41 Or L Rev 138 (1963), the author states at 148:

> "OR. REV. STAT. sec. 41.640 (1)(e) provides that, where the evidence is detailed and its examination in court would result in 'great loss of time' and where only 'the general result of the whole' is sought, other evidence of the contents of

the writings may be received by the court. Such was the common-law rule. \* \* \*"

■ The Oregon Lawyer's Trial Book, Summaries of Records § 13.7 (1967), summarizes the rule:

"Secondary evidence is admissible when the originals consist of numerous accounts or other documents which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole. ORS 41.640 (1)(e).

"Summaries are permitted when the originals are voluminous or complicated and the summary is the general result of the whole. McCORMICK ON EVIDENCE, 411 (1954). \* \* \*"

*See, Smith v. Abel,* 211 Or 571, 316 P2d 793 (1957); *Hubble v. Hubble,* 130 Or 177, 279 P 550 (1929); *Scott v. Astoria Railroad Co.,* 43 Or 26, 72 P 594, 99 Am St R 710, 62 LRA 543 (1903); McCormick, Evidence 411, § 199 (1954). When, as here, the challenged exhibits are taken from other evidence, material or documents available to both parties for examination and are consistent with the purposes of the statute, they are clearly admissible. Our attention is directed to no instance where the trial judge abused his discretion in the receipt of such material.

It would greatly prolong this opinion to examine here each of the remaining challenges to the court's rulings on evidence. Our examination of each satisfies us that they are without merit.

■ In the seventh assignment of error defendants contend the findings of the trial court do not comply with ORS 17.431. Portions of those findings, deemed relevant to this opinion, have been previously quoted. Defendants assert generally they contain "only intermingled conclusions of law, of which only some were

supported by vague and ambiguous findings of fact."[9] We note that defendants filed no motion as required by ORS 17.431 (1) for special findings of fact prior to commencement of trial. *See, Collins v. Lantz, Vickery,* 244 Or 62, 64, n 1, 415 P2d 763 (1966); *Ewauna Box Co. v. Weyerhaeuser,* 198 Or 360, 361, 255 P2d 121 (1953). They now contend that because the plaintiff did, they were not required to. We disagree. The purpose of the statute is to advise the trial court of the demands of each party in advance of trial. In a long and complicated trial involving a myriad of fact issues,[10] few of which are likely ultimately to prove decisive, the burden placed upon the trial court by the statute is a heavy one. A party seeking its application must himself comply with it.

■ Additionally, defendants in their final assignment of error challenge the court's overruling of their objections to its findings and conclusions and its denial of their request for voluminous special findings of fact and conclusions of law. (*See,* n 10.) They contend the court in its letter opinion, subsequently adopted by it as its findings of fact and conclusions of

---

[9] In Wells v. Davis, 258 Or 93, 480 P2d 699 (1971), the Supreme Court said:

"Findings of fact can assume any form the trial court desires as long as the court's intent to accord to its statements the character of findings of fact can be determined. In *State Highway Com. v. Brassfield,* 228 Or 145, 149, 363 P2d 1075 (1961), we stated that a letter from the trial court to counsel could constitute findings of fact if the trial court had indicated that was its intention." 258 Or at 96-97.

[10] Here defendants filed objections to the court's findings and moved to have the court adopt special findings of fact and conclusions of law submitted by them pursuant to ORS 17.431 (3). DeLong's requested findings of fact alone are 194 in number and occupy 35 pages in the abstract. Travelers sought a dozen additional findings. All were denied.

law, did not expressly rule on each of more than 200 specific findings of fact requested between them.

In *Howard v. Klamath County,* 188 Or 205, 215, 215 P2d 362 (1950), the Supreme Court said:

"The provision[s] of O.C.L.A., § 5-502 [now, in amended form, ORS 17.431] authorize any party litigant to object to findings made by the trial court and to request other different or additional findings, but notwithstanding the request of litigant for special findings, it rests in the discretion of the trial court to determine whether the findings shall be general or special. *Larsen v. Martin,* supra. *If the trial court elects to make special findings, it is not bound to make them upon every matter requested by a litigant:*

" '* * * special finding is a "statement of the ultimate facts on which the law of the case must determine the rights of the parties; a finding of the propositions of fact which the evidence establishes, and not the evidence on which those ultimate facts are supposed to rest." [citing cases] A special finding of facts, as said in the case last cited, "consists of a statement of the ultimate conclusions of the trial court upon issues of fact raised by the pleadings." * * *' *Larsen v. Martin,* supra.

"The objection commonly urged is that the findings do not support the judgment. In the case at bar, however, they exactly support the judgment and we think that findings were made upon all of the material issues. * * *" (Emphasis supplied.)

*See also, Leo v. Heller,* 255 Or 390, 392, 467 P2d 439 (1970).

We think the trial court made findings concerning every material fact necessary to its determination of the issues before it and to support its

conclusions of law based thereon. The law requires no more. These findings are amply supported by the evidence.

Discussion of the remaining assignments of error, whether on the appeal or on the cross-appeal, would add only prolixity to this opinion. We conclude that they are without merit.

Affirmed.