**TWIN RIVER CONSTRUCTION CO., INC., Plaintiff-Appellant,**

v.

**PUBLIC WATER DISTRICT NO. 6, Defendant-Respondent.**

**No. 44658.**

Missouri Court of Appeals, Eastern District, Division Four.

May 24, 1983.

Mogab & Hughes, Richard L. Hughes, St. Louis, for plaintiff-appellant.

Thurman, Nixon, Smith, Howald, Weber & Bowles, Louis Jerry Weber, Hillsboro, for defendant-respondent.

PUDLOWSKI, Presiding Judge.

Appellant Twin River Construction Company ("Twin River"), a water and sewer contractor, brought this action against respondent Public Water District No. 6 (the "Water District") to recover the balance allegedly due under a construction contract. Appellant sought judgment for a total of $71,701.34. Respondent acknowledged liability for only $12,905.03. The trial court disallowed most of appellant's claims and entered a judgment against respondent for $12,905.03. This appeal followed. We reverse and remand.

In early 1975, the Water District issued an invitation for bids to install extensions to its existing water main system. The work to be done was described in a set of detailed maps and drawings (the "plans") and in a booklet setting forth the technical data concerning materials to be used and construction techniques to be employed (the "specifications"). Procedural and legal aspects of the job were described in a statement of general conditions and special conditions (the "conditions"). The conditions stated that all of these documents were to be considered as the "contract documents". Bidders were instructed to carefully inspect all of these documents and the actual work sites before submitting bids.

According to the plans, extensions were to be installed in three different geographic areas (the "Hoene Springs" area, the "Four Ridge Road" area and the "Highway MM" area). The bid proposal, however, did not make reference to separate geographic areas. It treated the project as a whole and required the contractor to bid by "unit prices" by filling in a table, which we partially reproduce here:[1]

---

1. Cl. = "class"; L.F. = "linear feet".

... THE UNDERSIGNED further agrees that the stipulated amount for this work is inclusive of the SUMMATION OF UNIT PRICES AND ESTIMATED QUANTITIES.

## SCHEDULE OF UNIT PRICES

| Item | Description | Estimated Quantity | Unit Cost | Amount |
|------|-------------|--------------------|-----------|--------|
| 1. | 8" Ductile Iron River Crossing Pipe | 179 L.F. | $— | $——— |
| 2. | 6" Cast Iron Pipe | 1,879 L.F. | — | ——— |
| 3. | 6" Plastic Pipe Cl. 160 | 42,512 L.F. | — | ——— |
| 4. | 6" Plastic Pipe Cl. 200 | 8,830 L.F. | — | ——— |
| 5. | 4" Plastic Pipe Cl. 160 | 760 L.F. | — | ——— |
| 6. | 6" Gate Valve and Box | 36 Each | — | ——— |
| 7. | 4" Gate Valve and Box | 10 Each | — | ——— |
| 8. | 6" x 6" Tapping Valve and Sleeve | 3 Each | — | ——— |
| 9. | Fire Hydrant | 3 Each | — | ——— |
| 10. | 4" Cast Iron Pipe | 31 L.F. | — | ——— |

\* \* \*

STIPULATED AMOUNT        $_____

Rock excavation including blasting, hand labor, and disposal shall be considered incidental to the work no extra compensation will be allowed for said excavation. [sic] Areas of possible rock excavation are indicated on the plans and the Engineer's estimate of possible rock excavation within the areas designated is 700 cubic yards ....

---

The bid proposal forms stated that the contractor's total compensation would be based upon the actual quantity of each item installed multiplied by the unit price for that item. It was expected that the contractor would take differing soil conditions and obstacles into account and base his bid upon an average cost of installation for each item or linear foot.

Twin River's bid on the project was accepted by the Water District. The contract was signed on February 25, 1975, and approved by the Farmer's Home Administration (FmHA) on April 8, 1975. Work was scheduled to begin on May 5, 1975. The contract called for completion of the project within 270 days.

Because the issues presented on this appeal are primarily concerned with interpretation of the contract documents, we here set forth in pertinent part some of the more important contractual provisions.

The "Definitions" section of the general conditions broadly defines the term "contract documents":

It is understood and agreed that the Notice to Bidders, Instructions to Bidders, Proposal, Contract Agreement, Performance-Payment Bond, General Conditions, Special Conditions, Specifications and Plans, Addenda thereto, and duly authorized Change Orders, together with any and all supplementary drawings furnished by the Consulting Engineers as and when required to make clear, and to define in greater detail, the intent of the contract plans and specifications, other drawings, specifications, and engineering data furnished by the Contractor (when and as approved by the Owner or Consulting Engineers), and instructions furnished by manufacturers of equipment for the installation thereof, are each and all included in this contract, and the work shall be done in full compliance and accord therewith.

The following paragraphs were included in a section entitled "Responsibility of the Contractor":

c. *Quantities*.... Payment to the Contractor will be made on the basis of the actual quantities constructed and it is understood that the proposal quantities may be increased or decreased as hereinafter provided without invalidating the unit bid prices; further that the Contractor hereby forfeits all rights of action to

recover any anticipated profits occasioned by such increase or decrease in quantities.

\* \* \* \* \* \*

j. *Variations, Changes and Modifications.* The work contemplated in the contract documents may be subject to such changes as normally occur during construction. The Engineer, when acting within the authority entrusted to him, may order minor variations in the proportion and amount of work for which unit prices are quoted in the contract, provided such variations are consistent with the intent of the drawings and specifications and improve or expedite the work without materially affecting the total construction cost. The Owner reserves the right to make changes in the drawings and specifications and other changes in the contract quantities as may be considered necessary or desirable, provided such changes, alterations and modifications are effected legally and in accordance with the following procedures . . . .

k. *Extra Work.* No claim for extra work will be considered or allotted unless such extra work shall have previously been ordered by the engineer in writing *in the form of a contract change order.* The price paid for extra work shall be by the unit prices in the bidding schedule or by an agreed to lump sum for any work not covered by unit price bids.

l. *Change Order Documents.* Change order documents shall be used to effect changes which do not extend the physical boundaries of the originally contracted work provided the total value of all such changes does not increase or decrease the original total contract value by more than fifty per cent (50%).

Changes in the amount of work to be done shall be made on standard forms which will be furnished by the Owner or Engineer.

All change orders must be signed by all parties to the Contract and approved by the State Director for Missouri, Farmers Home Administration. Written approval must be received from the State Director for Missouri of the Farmers Home Ad-

ministration, United States Department of Agriculture, prior to any contract, change order or assignment of any right benefits or moneys becoming effective and binding upon the parties.

Additional language concerning changes appeared in the section entitled "Payments to the Contractor":

c. *Increased or Altered Work.* The amount of compensation to be added to or deducted from the contract price shall be determined, established and fixed by written agreement prior to making any increases, alterations, or modifications. Under unit price contracts, or under lump sum contracts containing unit prices for the respective items of work, the Contractor shall perform the additional or altered items at the unit prices shown in the Contract and shall not be entitled to any claim for damages, loss of profits or increased cost by reason of such increased, altered, or modified work when within the prescribed limits.

Other paragraphs govern the granting of extensions of time and provide for liquidated damages in the event of unexcused delay:

e. *Extensions of Time.* Should the Contractor be delayed in the *final* completion of the work by any act or neglect of the Owner or Engineer, or of any employee of either, or by any other contractor employed by the Owner, or by strikes, fire, or other cause or causes outside of and beyond the control of the Contractor and which, in the opinion of the Engineer, could have been neither anticipated nor avoided, then an extension of time sufficient to compensate for the delay, as determined by the Engineer, shall be granted by the Owner, provided, however, that the Contractor shall give the Owner and the Engineer prompt notice in writing of the cause of delay in each case.

Extensions of time will not be granted for delays caused by unfavorable weather, unsuitable ground conditions, inadequate construction force, or the failure of the Contractor to place orders for equip-

ment or materials a sufficient time in advance to insure delivery when needed.

f. *Liquidated Damages and Time for Completion.* ... If the said Contractor shall neglect, fail or refuse to complete the work within the time herein specified, or any proper extension thereof granted by the Owner, then the Contractor does hereby agree, as a part consideration for the awarding of this Contract, to pay to the Owner the amount specified in the Special Condition, not as a penalty but as liquidated damages for such breach of contract as hereinafter set forth, for each and every calendar day that the Contractor shall be in default after the time stipulated in the contract for completing the work ....

> (a) To unforeseeable cause beyond the control and without the fault or negligence of the Contractor, ....

*Provided, Further,* that the Contractor shall, within ten (10) days from the beginning of such delay, unless the Owner shall grant a further period of time to the date of final settlement of the contract, notify the Owner, in writing, of the causes of the delay, who shall ascertain the facts and extent of the delay and notify the Contractor within a reasonable time of its decision in the matter.

The amount of liquidated damages was elsewhere set at $50 per day. Language in the bid proposal documents also specified that:

> The Owner shall have the right to deduct said liquidated damages from any moneys in its hands, otherwise due, or to become due to said Contractor, or to sue for and recover compensation for damages for non-performance of this contract at the time stipulated herein and provided for.

At some time after the contract had been signed, but before any work had begun, the Water District decided to extend the planned construction in the Highway MM area by adding 3030 lineal feet of 4″ diameter pipe and a booster pump station in order to serve additional customers. Because no additional funds were available to pay for this extension, it became necessary for the Water District to cut back expenses in some other part of the project. The Water District determined that 4″ pipe could be installed along 23,471 lineal feet of the Highway MM extension instead of the 6″ pipe called for in the original contract. Twin River had bid $3.28 per lineal foot to install 6″ pipe and $1.90 per lineal foot to install 4″ pipe; the Water District therefore determined that it could save $1.38 per lineal foot ($32,389.98 altogether) by switching to 4″ pipe along part of the Highway MM extension. These funds would then be available to pay the $30,500 needed for the additional pipe and pump station planned for the Highway MM extension.

A.H. Herberts, the Water District's engineer, met on May 14, 1975 with Delbert Hunter, Twin River's president, to discuss the proposed changes. He presented Hunter with copies of two change orders which he had prepared in advance. Change order # 2 authorized the change from 6″ pipe to 4″ pipe and, based on the unit prices bid, resulted in a $32,389.98 decrease in the contract price. Change Order # 3 established a lump sum price of $30,500 for installation of 3030 feet of pipe and a pump station "in accordance with the governing plans and specifications." It stated that the price was intended to cover "all work indicated, including rock excavation if encountered and all building and electrical, pumps and piping. Herberts briefly explained the change orders to Hunter and showed him preliminary plans for the Highway MM booster pump station. Hunter indicated that he was not happy with the idea of getting $1.90 per lineal foot for a part of the job on which he had originally bid $3.28. Herberts replied that he had no authority to offer anything except the unit price bid for 4″ pipe, but that he could talk to the Water District's board. Hunter signed both change orders on behalf of Twin River. He testified at trial that he did so only to avoid delay in ordering the materials he needed, because it was essential to have a signed change order before ordering materials. Both change orders were forwarded to the

FmHA and were approved as required by the contract.

Twin River began work on the job site during the summer of 1975. Disputes developed between Twin River and the Water District concerning the order in which work was to be done, the allocation of responsibility for delays due to difficulty in getting parts, and the interpretation of Change Orders # 2 and # 3. Delays also occurred because of disputes between the Water District and property owners along the construction route concerning certain easements which the Water District was supposed to have secured.

On several occasions Twin River requested extensions of time. One extension for 30 days (Change Order # 5) was granted by the Water District and approved by the FmHA. This gave Twin River a total of 300 days to complete the contract. The 300th calendar day occurred on February 28, 1976. Another extension for 150 days (Change Order # 9) was recommended by the engineer and granted by the Water District, but the FmHA rejected the request because it concluded that the delays given as reasons for the request had been caused by the contractor.

Another Change Order, # 6, was submitted to the FmHA with the "conditional" approval of the Water District. This change order would have raised from $1.90 to $2.70 per lineal foot the cost of laying the 4″ pipe called for by Change Order # 2. Hunter, Twin River's president, contended that he had never really agreed to the $1.90 price, and that a higher price was necessary to fairly compensate him for his installation costs, which were approximately $2.20 per lineal foot in this area. Hunter had originally bid $3.28 per lineal foot to lay 6″ pipe in this area, $1.38 per lineal foot more than his bid of $1.90 for 4″ pipe in a different area. The parties agreed that 6″ pipe cost only about $.50 per lineal foot more than 4″ pipe. Hunter maintained that the remaining difference in his original bid was due to the difference in terrain between the areas where the original plans called for 6″ and 4″ pipe. The Water District did not agree

that the terrain was more difficult, but it nevertheless gave its conditional approval to a price change "if additional construction loan or grant funds be made available." The FmHA did not approve this change order.

Another dispute developed over the Highway MM pump station, which had been added to the project as a part of Change Order # 3. Hunter received the final drawings and specifications for the pump station on March 27, 1976, approximately one year after Change Order # 5 had been signed. During the summer of 1976, Hunter found out that according to the final drawings, he was expected to completely wire the pumps and control box, to install a transformer and connect the pump station to outside power lines. Hunter maintained that this type of work was not contemplated by the contract. The Water District disagreed. Hunter did install the pumps, but did not install the control panel or transformer. He refused to do any wiring on the pump station.

On September 16, 1976, Twin River advised the Water District that it had completed the work. It requested that the Water District's engineer inspect the job and certify it for final payment. On September 29, 1976, Herberts, the engineer, responded by sending Hunter a "punch list" of 26 items which needed to be done before he would certify that the project was complete. Several items involved cleanup of work sites and re-filling areas where the backfill had settled. Other items involved repairs of damage to property along the construction route. Some equipment needed to be replaced or installed, and the electrical wiring for the Highway MM pump station was not yet in place. Twin River refused to perform any of this work. On October 28, 1976, the Water District terminated its contract with Twin River.

The Water District completed most of the items on the punch list using its own employees. In November, the Water District obtained quotes from two contractors for the wiring job at the Highway MM pump station. The contractor who was hired was

already an employee of the Water District. He worked intermittently on the pump station as weather permitted and as parts arrived from suppliers. The MM pump station first became operable in late December, 1976, or early January, 1977, and customers began receiving service shortly afterwards. The project finally received the engineer's certificate of completion on March 4, 1977.

Twin River filed suit against the Water District to recover $71,701.34 which it claimed was still due under the contract. The trial court's findings, summarized, were: 1) that Change Order # 2 (the switch from 6″ to 4″ pipe) was valid and binding, thus reducing the contract price by $32,389.98. 2) That Change Order # 3 (which established a $30,500 price for the Highway MM water main extension and pump station) did require Twin River to provide the wiring and hookup for the pump station. The court allowed the Water District to set off $7,956.33 which it had expended in completing the wiring and electrical hookup. 3) That the contractor was not entitled to additional extensions beyond the thirty days granted by the Water District, because Twin River had failed to prove that any amount of its delay in completing the work was either unavoidable or due to the fault of the Water District. 4) That the Water District was entitled to an additional $4,205.00 set-off against the contract price for expenses it had incurred in operating the water line and in reimbursing property owners for damage incurred during construction. 5) That the Water District was also entitled to set-off $18,450 in liquidated damages for the 369 day delay in completing the project. The trial court computed these damages at $50 per day running from February 28, 1976 (the 300th day from commencement of the work) until March 4, 1977 (the date on which the engineer certified the project to be completed).

The trial court entered judgment against the Water District for $12,905.03, the amount which the Water District had admitted was due to Twin River under the contract. The trial court also ruled that Twin River was not entitled to any *pre*-judgment interest on this amount, because the contract required the Water District to make final payment *only* after all work had been certified as complete and after the contractor had presented satisfactory evidence that all debts for labor, materials and equipment had been fully paid.

On appeal, Twin River maintains that the trial court erred as a matter of law:

I. In enforcing the terms of Change Order # 2, because it did not comply with the change order procedure mandated by the contract, and further because it was not supported by consideration, or, alternatively, because it was procured by duress;

II. In allowing the Water District to set off $7,956.33 against the amount due under Change Order # 3, because the language of that change order, taken in the context of the whole contract, could not be interpreted as requiring Twin River to wire the pump station;

III. In failing to give effect to Change Order # 9 (the 150 day extension) because the contract did not require FmHA approval for extensions of time;

IV. In allowing liquidated damages to run beyond October 28, 1976, the date on which the contract had been terminated; or alternatively, in allowing liquidated damages to run until March 4, 1977, even though the work could reasonably have been completed at a much earlier date;

V. In allowing the Water District to set off both liquidated and actual damages against the contract price; and

VI. In failing to allow prejudgment interest.

We will discuss these points in order.

I

■ In this point, Twin River contends that Change Order # 2: 1) was not autho-

rized by the change order procedure as contemplated by the contract, 2) was not supported by consideration, or alternatively, 3) was obtained by duress.

Twin River first argues that "unit prices" as bid by the contractor could not apply to work in a different geographic area, or of a different character than that originally bid by the contractor. 17A C.J.S. Contracts § 371(8) at p. 416. Twin River had bid $1.90 per lineal foot to install 760 lineal feet of 4″ pipe in one part of the Highway MM extension, but ended up installing an additional 23,471 lineal feet of 4″ pipe in another part of the Highway MM extension. Twin River had originally bid $3.28 per lineal foot to install 6″ pipe in that latter area. The parties agreed that the cost of the 6″ pipe itself was only $.50 per foot more than 4″ pipe. The same size trench would have to be dug for either size pipe. Hunter testified that he based his higher bid for 6″ pipe on different terrain in the areas where 6″ pipe was to be laid, but did not describe any specific differences between the area where 4″ pipe was originally planned and the area where it was eventually installed. Herberts, the engineer, testified that the 23,471 feet covered by Change Order # 2 included about 1,600 to 1,800 feet of rock excavation; it was generally more level than the other areas where 6″ pipe had originally been planned. The trial court did not make a specific finding concerning any difference in the terrain, but ruled generally that "the more credible testimony on all of the issues in dispute between the parties was that presented by the [Water District]."

The contract itself does not limit use of the "change order" procedure to contiguous geographic areas. Twin River presented no evidence to show that the terrain covered by Change Order # 2 was materially different from the terrain on which the bid to lay 4″ pipe was based; indeed, the trial court believed that the terrain was *not* different. The facts do not support Twin River's claim for compensation in excess of the unit price bid.

Twin River contends that the change order is unenforceable for lack of consideration. Parties are ordinarily free to modify a contract after making it, notwithstanding any provisions in the contract purporting to limit such freedom. *Smith v. Githens*, 271 S.W.2d 374, 380 (Mo.App.1954). The agreement to modify must itself possess all the elements necessary to form a contract, including the element of consideration. *Id.* Such consideration is not present when one party merely agrees to do that which it was already legally liable to do for a greater consideration, nor is it present when one party agrees to do less than it is already obligated to do for the same or greater consideration. *R-Way Furniture Corp. v. Powers Interiors Inc.*, 456 S.W.2d 632, 637 (Mo.App.1970). While an agreement made in substitution of a prior executory contract annuls the former contract and is itself a sufficient consideration for release from its obligations, the substituted agreement must contain a change of the obligation of each party in order to constitute a consideration. *Barr v. Snyder*, 358 Mo. 1189, 219 S.W.2d 305 (Mo.1956); *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327, 331 (Mo.App.1954). The gist of Twin River's argument is that its obligations did not change—that it had to dig the same trench in the same ground for less money. This ignores the fact of its reduced materials cost due to the change from 6″ to 4″ pipe. Even assuming *arguendo* that the terrain involved was more difficult than the terrain for which 4″ pipe was originally bid, it is still true that *both* parties to the contract assumed different obligations as a result of Change Order # 2. Twin River agreed to perform different work, and the Water District promised to pay a different price for that work. Without a showing of fraud courts are not empowered to ignore a contract on the basis that the consideration is of inadequate value. *Hathman v. Waters*, 586 S.W.2d 376, 385 (Mo.App.1979). We hold that the change order in the present case was supported by legally sufficient consideration.

Twin River also argues that Change Order # 2 was invalid because it was

obtained by duress. This theory was never presented in Twin River's petition and cannot be raised for the first time on appeal. An issue not pleaded, proved, or even alleged in any motion for new trial may not be raised for the first time on appeal. *South Side Plumbing Co. v. Tigges,* 525 S.W.2d 583, 590 (Mo.App.1975).

## II

■ Twin River's second point on appeal challenges the trial court's interpretation of Change Order # 3. Signed the same day as Change Order # 2, Change Order # 3 established a lump sum price of $30,500 for the installation of additional pipe and a pump station in the Highway MM portion of the project. Twin River has refused to wire the pump station, claiming that the contract required only that it install the pumps and controls without providing the electrical hookup. The trial court allowed the Water District to set off $7,956.33, the amount it paid to complete the pump station, against the amount due under Change Order # 3.

Twin River argues that the language of the contract could not, as a matter of law, be interpreted as requiring it to wire the pump station. The Water District, on the other hand, argues that 1) the language of the change order itself clearly indicated that Twin River was expected to wire the pump station, 2) that the change order clearly disclosed that the pump station would be built according to final plans which were still to be prepared, and 3) that ambiguities in the contract, if any, must be resolved in favor of the Water District, a public entity.

The addendum to Change Order # 3 recited that the order was intended to provide for "the installation of a booster pump station along Highway MM in accordance with the governing plans and specifications. The change order establishes a lump sum amount for all work indicated, including rock excavation if encountered and all building and electrical, pumps and piping."

The preliminary drawing, examined by Hunter at the time the order was signed, depicts the pump building, two pumps, piping, and a generator stand. The final drawings, delivered to Hunter on March 29, 1976, include a transformer unit, a pump control panel, a lighting control panel, starter units for the pumps, and a wiring diagram for all equipment. The original contract specified that the contract terms included "specifications and plans, addenda thereto, and duly authorized change orders, together with any and all supplementary drawings ... as and when required to make clear, and to define in greater detail, the intent of the contract plans and specifications."

The original plans on which the bid was based had included two other pump stations at different locations. The original contract specifications required Twin River to "[f]urnish all labor, materials and equipment necessary to complete the installation and make operable all pumps and motors ...." The parties agreed that Twin River had not been obligated to provide the wiring for these pump stations. The wiring job had been bid and let as a separate contract.

The Water District's engineer, Mr. Herberts, testified on cross-examination concerning the meeting at which Hunter signed Change Order # 3:

Q How was he [Hunter] supposed to figure out whether or not he could do what you wanted him to do for $30,500 without losing his tail, if I can use the vernacular?

A That's a good question.

Q What did you tell him?

A I can't answer that.

Q Well, did you just—did you tell him what the work was?

A To the three change orders—we're discussing Change Order 2 and 3.

Q # 3 I'm talking about now.

A Change Order # 3 we discussed the generalities of that work, because there were not final plans drawn at that particular time.

Q All right. Did you show him some plans and specifications?

A We showed him a plan sheet; no specifications.

\* \* \* \* \* \*

Q (By Mr. Hughes) There is nothing on that sheet, if I recall, about electrical? You went over it on direct examination?

A That's correct, sir.

Q But, it does show the pumps and various other things. These are electrical items—the generator, and apparently that's the location for that that's shown?

A Yes, sir.

Q So that in context the word "electrical" or "electrical equipment" was involved in the discussion?

A Yes, sir.

Q But if I understand you correctly, there was no detailed conversation at that point about the necessity for wiring the electrical, for hooking up the electrical equipment, is that right?

A There were no defined elements, yes, sir.

\* \* \* \* \* \*

Q You didn't have any information at that time, for example, that there was a necessity of a phase converter or transformer and you didn't discuss that with him?

A No, sir.

Q You knew at that time, did you not, sir, that Delbert Hunter was not an electrical contractor installing a water line?

A He's not advertised as an electrical contractor, no sir.

Q In connection with the original bid contract there was no work in that original contract for electrical hookups, although he was required to place electrical equipment?

A That is correct.

Q He was not going to do the wiring?

A Yes, sir.

Q Who did the wiring under that contract?

A The electrical for those two installations was let in the January bid letting.

Q Separately?

A Separately, yes, sir.

\* \* \* \* \* \*

Q But, in any event, Delbert is asked to sign Change Order # 3 for $30,500 which allegedly includes a lot of detailed wiring, although the amount wasn't known to anybody at that point, and in your mind, anyway, you realized that this is not something that he does. So did it seem reasonable to you that he would accept a figure like that without knowing what the electrical cost was? How could he conceivably bid this job from an engineering standpoint?

A I don't know, sir.

Q It's not possible, is it?

A It's not practical.

The Water District argues that all ambiguities, presumptions, and implications in a public contract must be resolved in favor of the governmental party, citing 17 Am.Jur.2d, Contracts, § 289 at p. 703. This is not the law in Missouri. "A contract must be resolved most strongly against, and any doubt must be resolved against, the party who prepared it. [citing cases.] This rule is applied to governmental agencies. [citing cases]." *Webb-Boone Paving Co. v. State Highway Commission,* 350 Mo. 896, 169 S.W.2d 336, 339 (Mo.1943). We must give the language of the contract a "fair, reasonable and practical construction," *Needles v. Kansas City,* 371 S.W.2d 300, 305 (Mo.1963), after examining "not only the language and grammatical construction of the provision in dispute, but also the subject matter of the contract and the circumstances which surround its execution." *Reddi-Wip Inc. v. Lemay Valve Co.,* 354 S.W.2d 913, 920 (Mo.App.1962).

The language of the change order does not clearly disclose the intent of the parties. Reading Change Order # 3 in context with the preliminary plans (which did not show any wiring), the prior course of conduct between the parties with regard to the two other pump stations (which clearly excluded wiring from the contract), and the admission of the Water District's engineer that the meaning of the term "electrical" was not discussed, we hold that the contract did

not bind Twin River to provide wiring and connection to an outside power source. The inclusion of the wiring in later plans is not controlling. While it is true that "matters not presently in existence may be made a part of the contract by reference," 4 Williston on Contracts (3rd ed.) § 581 at p. 138, "[t]his should not be taken to mean ... that items such as plans and specifications unagreed upon may be incorporated without some identification in the original contract and some form of adoption by the person sought to be charged with performance." *Martinson v. Brooks Equipment Leasing Inc.,* 36 Wis.2d 209, 152 N.W.2d 849, 853 (1967), rehearing denied 36 Wis.2d 209, 154 N.W.2d 353; *Hensel Phelps Construction Co. v. U.S.,* 413 F.2d 701, 702–703 (10th Cir.1969).

The Water District was therefore not entitled to set off its cost of "completing" the Highway MM pump station against the contract price. We note, however, that Twin River acknowledged its responsibility to provide the control panel for the pump station. Twin River had ordered the control panel but never picked it up or paid for it. The Water District was entitled to set off $1,844.00, the cost of this control panel, against the contract price.

### III

In its third point on appeal, Twin River contends that the trial court erred in finding that FmHA approval was required before requests for extensions of time could become effective. Twin River contends that Change Order # 9, which would have extended the time for completion by 150 days, was therefore valid even without FmHA approval. It is true that the paragraphs of the contract dealing with extensions of time did not discuss any need for FmHA approval. We must, however, construe the contract as a whole, *Planter's Nut & Chocolate Co. v. Douglas Candy Co.,* 240 S.W. 473, 474 (Mo.App.1922), and give due consideration to the acts and conduct of the parties under the contract. *City-wide Asphalt Co. v. City of Independence,* 546 S.W.2d 493, 495, 499 (Mo.App.1976); *Mere-*

*dith Development Co. v. Bennett,* 444 S.W.2d 519, 523 (Mo.App.1969). The parties here regularly used change order forms to effect extensions of time and regularly submitted these forms to the FmHA for approval. Parties to a contract may make their performance conditional on the determination of a question or act by a third party. *Juengel Construction Co. v. Mt. Etna, Inc.,* 622 S.W.2d 510, 514 (Mo.App. 1981). That determination is binding so long as the decision of the third party is not arbitrary, capricious, or in bad faith. *Id.; Norman v. McLelland,* 354 S.W.2d 906, 910 (Mo.App.1962). Twin River makes no claim that the FmHA acted arbitrarily or in bad faith in rejecting Change Order # 9. Because we hold that the contract did require FmHA approval for extensions of time, Change Order # 9 never took effect and did not modify the agreement between the parties.

### IV

In its fourth point, Twin River contends that the trial court erred in allowing liquidated damages to run until March 4, 1977. Twin River argues that no liquidated damages could accrue after October 28, 1976, the date on which the Water District terminated the contract. Alternatively, Twin River argues that liquidated damages could accrue only for the time reasonably necessary to enable the owner to complete the project, and that the time allowed by the trial court (more than four months) was excessive.

*Moore v. Board of Regents,* 115 S.W. 6, 12–13, 215 Mo. 705 (1909) appears to be the sole Missouri case addressing this question. That case refused to allow liquidated damages after the date on which the owner took charge of the work. *Bloomfield Reorganized School District No. R–14 v. Stites,* 336 S.W.2d 95 (Mo.1960), is cited by the Water District as contrary authority, but is clearly not on point. The liquidated damages awarded in that case did not run past the date on which the contract was terminated. The court found that the liquidated damages clause involved was valid and not a

penalty but did not rule on the question presented to us here.

Authorities in other jurisdictions are divided: Some courts hold that liquidated damages are no longer available after abandonment of the work, reasoning that the contractor should not be responsible once he loses his ability to control the date of completion. *McGovney & McKee, Inc. v. City of Berea,* 448 F.Supp. 1049, 1059 (E.D.Ky. 1978) *aff'd* 627 F.2d 1091 (6th Cir.1980); *Louis Lyster General Contractor v. City of Las Vegas,* 83 N.M. 138, 489 P.2d 646, 654–655 (N.M.1971). Other courts have allowed liquidated damages for a "reasonable" time after abandonment by the contractor or termination by the owner. *City of Boston v. New England Sales & Mfg. Corp.,* 438 N.E.2d 68, 386 Mass. 820 (1982); *State Highway Comm'n v. DeLong Corp.,* 9 Or. App. 550, 495 P.2d 1215 (Or.1972); *Austin-Griffith Inc. v. Goldberg,* 224 S.C. 372, 79 S.E.2d 447 (S.C.1953). See generally cases cited in 5 Williston on Contracts § 785 at Notes 11 and 12; Annot., 43 ALR 2d 1134.

We are not disposed to depart from *Moore v. Board of Regents, supra,* until a contrary rule is declared by our Supreme Court. Accordingly, we hold that the trial court erred in allowing the Water District to collect liquidated damages after October 28, 1976. The trial court allowed $18,450 in liquidated damages for a 369 day delay running from February 28, 1976, to March 4, 1977. Recomputing the amount due for the period from February 28 to October 28, 1976, results in a set off of $12,200 for 244 days delay.

### V

■■■■ Twin River's fifth point on appeal maintains that the trial court erred in allowing the Water District set-offs against the contract price for both liquidated damages at $50 per day *and* its actual costs of completing the work. *Bloomfield Reorganized School District No. R–14 v. Stites, supra,* 336 S.W.2d 95, 100, is clear authority to the contrary. In that case, our Supreme Court allowed set-offs of both actual and liquidated damages against the price of a construction contract. It is true that liquidated and actual damages may not be awarded as compensation for the same injury. See *Arnett v. Keith,* 582 S.W.2d 363, 365 (Mo.App.1979). But "the vice to be guarded against is a duplication of damages." *Louis Lyster General Contractor v. City of Las Vegas, supra,* 83 N.M. 138, 489 P.2d 646, 654. The contract before us here can fairly be read to authorize both types of damages; actual damages related to the cost of completion, and liquidated damages to compensate for losses resulting from the delay (for instance, revenue lost because service was not available to customers as scheduled). Damages of the latter type could not easily be calculated and are a proper subject for a liquidated damages clause. Twin River does not argue that the $50-per-day figure is unreasonable, duplicative, or disproportionate to the actual losses caused by its delay. We hold that the trial court did not err in interpreting the contract as providing for set-offs of both liquidated damages and the Water District's costs of completing the project.

### VI

■■■■ In its sixth and final point on appeal Twin River argues that the trial court erred in failing to award it prejudgment interest on amounts due under the contract. The trial court found that Twin River was not entitled to prejudgment interest because the contract provided for payment only after the contractor had completed the work, made a request for final payment, and furnished evidence that all debts for labor, materials, and equipment had been fully paid. The record before us shows that Twin River did make a request for final payment which at least claimed that the work was completed. The record does not show whether the Water District was furnished with any evidence concerning the payment of debts. However, once the Water District had terminated the contract and took over the work, it could not insist that Twin River continue to follow contractual procedures in order to get paid. *Sides Constr. Co. Inc. v. Arcadia Valley R–2*

*School Dist.,* 565 S.W.2d 761, 771–772 (Mo. App.1978). In determining whether prejudgment interest should be awarded, the significant questions are whether and when the amount due became "liquidated." "A claim may be said to be liquidated so as to bear interest when the amount due or to become due is fixed by law or by agreement between the parties. The mere fact that a party denies liability or defends a claim against him, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest; for it is the character of the claim and not of the defense to it that determines whether it is liquidated." 47 C.J.S. Interest and Usury § 21 at p. 62 (footnotes omitted); *Foley Co. v. Walnut Associates,* 597 S.W.2d 685, 691 (Mo.App.1980). "The existence of an unliquidated set-off or counterclaim against the claim does not necessarily bar interest on the claim." *Eastmount Const. Co. v. Thompson Mfg. & Equip. Co.,* 301 F.2d 34, 42–43 (8th Cir.1962).

 "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, and (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation." *General Facilities Inc. v. National Marine Service Inc.,* 664 F.2d 672 (8th Cir.1981). Moreover, § 408.020 RSMo (1978) (1982 Supp.) mandates that interest be awarded to creditors "for all monies after they become due and payable, on written contracts . . . ." We hold that the amount due was ascertainable at the time of the contract's termination.

Even though several items were disputed, the amounts in dispute were capable of being computed by the parties. *Foley Co. v. Walnut Associates, supra,* 597 S.W.2d at 691. Twin River is therefore entitled to interest at the rate of 6% per annum from October 28, 1976 to July 3, 1979, increased to 9% per annum after July 3, 1979. *White v. St. Louis-San Francisco Rwy. Co.,* 602 S.W.2d 748 (Mo.App.1980).

In recapitulation, the amount due to appellant Twin River is as follows:

|  |  |
|---|---|
| $12,905.03 | Adjustment to set-off for wiring. |
| + 6,112.33 | Adjustment to liquidated damages. |
| + 6,250.00 | (exclusive of interest) |
| $25,267.36 | |

The cause is reversed and remanded to the trial court with directions to enter judgment for Twin River Construction Company for the amount of $25,267.36 plus interest as computed above.

SMITH and KELLY, JJ., concur.