James E. JOHNSON, Jr. and Kathy Johnson, Plaintiffs–Appellants,

v.

Edgar W. GREGG, Carol L. Gregg, Rickey Wolfe, Lisa Wolfe, and Peoples Bank of Clever, Defendants–Respondents.

No. 17082.

Missouri Court of Appeals, Southern District, Division Two.

April 25, 1991.

Robert M. Sweere, Springfield, for plaintiffs-appellants.

Robert S. Wiley, Crane, for defendants-respondents, Rickey and Lisa Wolfe.

SHRUM, Judge.

The Johnsons brought this action against the Greggs seeking specific performance of a contract for the sale of real estate and, in an alternative count, damages. The Johnsons also sued the Wolfes, as subsequent purchasers of the property, and a bank seeking to quiet title in the property. The Wolfes counterclaimed for rent and possession. Following a bench trial, the court found against the Johnsons on their claims and on the Wolfes' counterclaim. The Johnsons appeal; we affirm.

## FACTS

In October 1987, the Johnsons and the Greggs entered an agreement concerning a

five-acre tract of land in Clever, Missouri. Among the improvements on the property were a house and a workshop. The parties memorialized their agreement with two preprinted documents approved for use by members of the Greater Springfield Board of Realtors. The first document was Form 7801, denominated "Real Estate Sale Contract." At the top of page one of the "sale contract" appears the hand-written notation "Lease Option." The contract indicates a sale price of $45,900 with the following terms of payment: $1,000 deposited with the Greggs "as an earnest money deposit to be applied to sale price on closing or to liquidated damages on default of Buyer," $41,900 to be paid by the Johnsons' obtaining a new loan, and $3,000 additional cash on closing.

The contract form contains the following preprinted contingency (the underscored "NA" was supplied by the parties):

This contract is contingent upon approval and commitment by lender of above financing. Buyer shall make loan application within __NA__ working days after contract acceptance, and exercise diligence to obtain necessary financing and provide all documents deemed necessary by lender.

In the following handwritten provision, the parties stated the contract was contingent on:

500.00 mo. for 12 mos. beginning Nov. 1, 1987—The $1,000 represents 1st and last mo. pay. At the end of 12 mos. $4,000 goes to the credit of buyer's down pay't & 2,000 as rent. If buyer fails to perform at the end of 12 mos. and does not purchase property then all monies rec'd by seller become rent & are non-refundable.

The parties struck from the contract form the following preprinted statement: "If the above contingencies are not met as specified, this contract shall terminate and, if not disputed, Buyer's deposit shall be refunded less any expenses incurred on Buyer's behalf, such as survey, credit report, appraisal and inspections."

In the preprinted paragraph 6, "Closing Date and Possession," the parties did not fill in the blank indicating an anticipated closing date. On page 2, the contract form contains the following preprinted provision: "12. Closing Procedures: Necessary title information shall be ordered by Seller with reasonable promptness after contingencies are met."

The second document the parties completed in October 1987 was Form 7805, "Contract Addendum: Agreement for Possession Prior to Closing." By that addendum, the parties agreed the Johnsons would pay the Greggs rent of $500 a month for 12 months and that the Greggs would provide insurance on the property. The addendum contained this "Special Agreement": "This Lease is for 12 months unless buyer decides to exercise his option to purchase."

The Johnsons signed the documents on October 22, 1987; the Greggs on October 28, 1987. Both documents were prepared with the assistance of Frankie Zirkle who is identified in the sale contract as agent for the listing and selling broker. In October 1988, again with the assistance of Ms. Zirkle, the parties executed a "Change Addendum," Board of Realtors Form 8607, in which they agreed to the following:

All original terms to remain the same on contract dated Oct. 28, 1987 and be extended from Nov. 1, 1988 to Nov. 1, 1989, with the exception that all payments made from Nov. 1, 1988 to Nov. 1, 1989 will go 100% toward down payment. [Johnsons] to provide the Greggs with a fire policy.

None of the documents signed by the parties contains an express provision that time was of the essence of the contract.

Some essential facts are undisputed. Throughout the course of the Johnsons' and Greggs' dealings, James Johnson acted on behalf of Kathy Johnson and Edgar Gregg on behalf of Carol Gregg. The Johnsons paid the initial $1,000 and the $500 a month pursuant to the agreement. James Johnson told Edgar Gregg in June 1989 that the Johnsons intended to complete the purchase of the property. In late October 1989, Johnson reiterated to Gregg his intention to consummate the transac-

tion. Edgar Gregg testified James Johnson told him on several occasions during the latter half of 1989 that "[h]e was trying to buy it...."

Evidence concerning the parties' conduct during the period late October through December 7, 1989, must be recounted in greater detail. Trial testimony crucial to this appeal centered on the Johnsons' attempts to obtain financing and on several telephone conversations, primarily between James Johnson and Edgar Gregg. The telephone conversations, most of which occurred in the period from late October through early December 1989, principally relate to the Johnsons' claim that the Greggs waived certain time limitations in the contract.

Concerning his attempts to obtain financing in order to close the transaction, James Johnson said he had intended to save money from his earnings to be able to complete the purchase. He said that it "finally soaked in in the latter part of October [1989]" that he would not have the cash to close the transaction. Johnson admitted he and his wife made no attempt prior to late October 1989 to obtain a loan to complete the purchase. On or about October 20, 1989, Johnson inquired about (but did not apply for) a loan from defendant People's Bank of Clever, an institution located two blocks from the property the Johnsons wished to purchase. On October 26, 1989, Johnson offered Gregg $10,000 cash and asked Gregg to "carry the balance." Johnson said Gregg declined and told him he needed all his money to "settle his divorce."

In addition to asking Edgar Gregg to serve as lender, Johnson applied for a loan at Commerce Bank of Nixa on November 3. One week later, Commerce Bank notified Johnson that it declined to make the loan. On November 13, Johnson contacted Hugh Merritt, an investor, about providing financing. Merritt inspected the property and told Johnson he would consider making the loan. On November 22, Johnson testified, Merritt told him he would lend him

$26,000. After applying the $10,000 credit for rent payments, the Johnsons would have needed approximately $10,000 cash to close the transaction. Johnson said he had the $10,000—$4,000 saved from earnings and $6,000 from his father-in-law—"at home in the speaker."

On several occasions James Johnson and Edgar Gregg spoke by telephone concerning Johnson's attempts to obtain financing. One telephone conversation in late October between Johnson and Gregg precipitated considerable questioning at trial. Johnson testified he told Gregg he would arrange for financing "as soon as possible." Johnson said Gregg asked him, "Are we talking two or three weeks or what?" Johnson said he responded, "I would get it put together as soon as I could." Johnson said he understood Gregg had given him until December 1 to complete the purchase. Johnson testified that pursuant to that telephone conversation he sent a $500 check, dated October 31, to Carol Gregg.[1] The October 31 check bears the notation, "Extension on lease."

Edgar Gregg's testimony about that particular late October telephone conversation differs from Johnson's account. Gregg said he told Johnson, "I needed the money, his time was running ... the contract was due to expire, and I wanted to get it settled, and he needed a couple of more weeks which I had heard for two years when I'd approach him on closing the deal as per our agreement.... I said, 'Two weeks.'" Gregg said the October 31 check was for rent.

Telephone contacts (and attempted telephone contacts) between Johnson and Gregg continued during November and early December 1989. On November 6, Johnson told Gregg about his loan application at Commerce Bank. On November 21, Gregg called Johnson to inquire about Johnson's progress toward obtaining financing. Johnson told Gregg he was "95 percent sure, 99 percent sure, that I had the loan, but that I had not had 100 percent confirmation yet, and that as soon as I did re-

---

1. The Greggs were divorced in December 1988. Beginning with the April 1989 payment, the Johnsons sent their monthly checks to Carol Gregg.

ceive it I would contact him." Later on the 21st Gregg again called Johnson seeking confirmation of the financing. Johnson said he "was working on it." On November 22, Gregg called Johnson at work and told him he had to have confirmation that day. On cross-examination, Johnson admitted Gregg told him on November 22 "that he had another interested buyer, and that he needed to sell the property." About 5:00 p.m. that day, Johnson testified, Hugh Merritt called him to tell him he would make the loan.

Johnson said he attempted twice the evening of November 22 to contact Gregg at his home in Branson at a telephone number Gregg had given him. He reached an answering machine with each call. Later Johnson discovered the telephone number he was dialing was incorrect. On November 23, Thanksgiving, Johnson made no attempt to contact Gregg because "[i]t was a holiday." On the 24th Johnson made two calls, one to Gregg's employer in Branson and one to Carol Gregg's home in Hollister. Someone at Gregg's place of employment told Johnson that Gregg was out of town for "ten days to two weeks." Johnson did not recall with whom he spoke at Carol Gregg's home but "I indicated I needed to get ahold of Mr. Gregg.... I believe I asked to leave a message, and they took my name and number or they knew who I was." Asked whether he was concerned, on and immediately following November 22, that if he did not notify Gregg by December 1 that he had obtained a loan that Gregg might not sell the property to him, Johnson responded, "I knew I had to get ahold of Mr. Gregg, yes."

Gregg testified Johnson knew his work required frequent travel, and he said his employer forwarded messages to him.

Carol Gregg testified she was able to contact her former husband at any time he was on the road with his work. She said Johnson never asked her to get in touch with her former husband during the period November 22 to December 4, 1989.

On December 4, Johnson contacted Edgar Gregg at Carol Gregg's home. Johnson told Gregg he had the loan and, for the first time, identified Hugh Merritt as the lender. On December 5, Johnson called Gregg at his home. Johnson said Gregg told him he had "some kind of liens on the property that had to be cleared up before we could proceed...."

Edgar Gregg testified he telephoned Hugh Merritt on December 4 or December 7 to confirm "[i]f [Johnson] had the money.... Gregg said Johnson 'would have had the property, if I had any confirmation at all. I wanted confirmation from anybody.' Gregg admitted he would have sold the property to the Johnsons if he had received loan confirmation from Merritt. Gregg said Merritt told him he would make the loan if he received "a clear title and title insurance...." Gregg said that when he told Merritt there was a mortgage on the property and liens at People's Bank, Merritt responded, "Well, that wasn't what he indicated to me." Based on his conversation, Gregg concluded "there was no firm deal" between Merritt and the Johnsons. On the morning of December 7, Gregg testified, he called Johnson at work and told him he had decided to sell the property to somebody else.[2]

Hugh Merritt's testimony concerning his telephone conversation with Edgar Gregg differs from Gregg's account. Merritt testified, "I remember that he asked me if I

---

2. In June 1989, defendant Rickey Wolfe told Gregg he was interested in the property, and in September Wolfe and Gregg "talked price." At some point, the Greggs apparently agreed to sell the property to the Wolfes for $35,500, and on October 13, 1989, the Wolfes applied for a loan from defendant People's Bank of Clever to complete the transaction. On November 22, Edgar Gregg accompanied Rickey Wolfe to People's Bank to deliver the abstract of title to the property. On December 7, after Gregg told Johnson he was going to sell the property to someone else, Johnson called a loan officer at People's Bank, where the Gregg/Wolfe transaction was to be closed, and threatened a lawsuit. Nevertheless, the loan officer closed the transaction between the Greggs and the Wolfes on December 7. Prior to the closing, the loan officer and the Wolfes were aware of the Gregg/Johnson real estate contract and that the Johnsons were in possession of the real estate. The Wolfes also were aware, prior to closing, of the subject matter of Johnson's telephone call to the loan officer.

was financing the place, was intending to, and I told him, yeah, that I'd already committed, and that the money was ready when he got the papers ready.... He didn't seem to want to accept it as I remember, because he said he had a buyer with the money ready to go, and I said 'Well, that's no problem; the money is ready to go here when you get ready, when the papers is [sic] ready.'" Merritt said "the papers" meant "[t]itle insurance and the proper papers that you have on a real estate deal." Although he did not specify a date, Merritt said he told Johnson prior to Thanksgiving (which was November 23) that he would lend him the money. Merritt was less resolute in his testimony when asked on cross-examination about other details of his arrangement with the Johnsons.

Following the sale of the property to the Wolfes, the Johnsons filed this lawsuit, seeking specific performance of the sale contract with the Greggs. Alternatively, they sought from the Greggs damages of $16,000 which included the difference between the contract price and the present market value of the property plus the $10,-000 in monthly payments which was to have been credited toward their down payment.

The trial court found against the Johnsons on their claims against the Greggs for specific performance or damages and awarded the Greggs attorney fees of $1,925.00. The court found for the Wolfes on their counterclaim and ordered the Johnsons to surrender possession of the real estate and pay the Wolfes $3,500.00 as rent plus $500.00 a month until they delivered possession.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

In their sole point on appeal, the Johnsons contend the substantial weight of the evidence demonstrates that the Greggs waived any time requirements in the contract concerning "a notice or closing date" in that "all of the testimony" established that the Greggs gave the Johnsons additional time to acquire their financing and close the transaction, that the Greggs con-

sidered the Johnsons' contract rights in existence until December 7, 1989, and that the Greggs, on that date, "declared a forfeiture" without warning.

■ If by "all of the testimony" the Johnsons mean there was no evidence to the contrary, then they misread the trial transcript. If by "all of the testimony" they mean that favorable trial testimony somehow outweighed the unfavorable, then their point relied on misstates our role in reviewing a court-tried case under the standards of Supreme Court Rule 73.01(c) and *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The phrase "weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. The weight of the evidence is not determined by mathematics; it depends on its effect in inducing belief. *Plunkett v. Parkin*, 788 S.W.2d 356, 357 (Mo.App. 1990); *Land Clearance for Redev. Auth. v. Joplin Union Depot Co.*, 429 S.W.2d 806, 813 (Mo.App.1968).

■ On appeal of a court-tried case, we give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Estate of Moore*, 802 S.W.2d 192, 194 (Mo.App.1991). The trial judge as trier of fact may disbelieve testimony even if it is uncontradicted. *Plunkett*, 788 S.W.2d at 357. As here, where the trial court makes no findings of fact, we consider all fact issues to have been found in accordance with the result reached. *White v. American Republic Ins. Co.*, 799 S.W.2d 183, 190 (Mo.App.1990). In a court-tried case, we are to sustain the judgment of the court if the result was correct on any tenable basis. *Strunk v. Hahn*, 797 S.W.2d 536, 538 (Mo.App.1990).

## ANALYSIS AND DECISION

■ On appeal, the parties disagree in the characterization of the agreement. The Wolfes treat the various documents as constituting a lease-option arrangement. In their reply brief, the Johnsons insist that the agreement is not an option "but rather a contract of sale which the parties titled as an option...." The labels the parties attach to an agreement are not conclusive.

*Butler v. Centerre Trust Co.*, 656 S.W.2d 831, 835 (Mo.App.1983). We look to the contract in its entirety to determine the intent of the parties and their rights and obligations under the agreement. *Id.* at 834.

When they signed the agreement in October 1987, the Johnsons were aware they would need an amount equal to the purchase price less accrued credit for monthly payments in order to consummate the transaction. Thus they agreed to make monthly payments of $500 and to exercise diligence to obtain the necessary loan approval and commitment. They also acknowledged all their payments were non-refundable as rent if they did not "perform at the end of 12 mos." In the change addendum of October 1988, the Johnsons reiterated their agreement to make monthly payments and to exercise diligence in obtaining a loan, and they again acknowledged all their payments were non-refundable as rent if they did not "perform" prior to November 1, 1989.

 There is no dispute the Johnsons made the monthly payments as agreed. The second obligation the Johnsons undertook involved their efforts to obtain financing. Whether or not the Johnsons used diligence in obtaining financing is a question of fact. *Alice Blake, Inc. v. Hoffman*, 620 S.W.2d 20, 22 (Mo.App.1981). Moreover, the Johnsons have the burden of proving they exercised diligence in pursuing a loan. *Edward L. Bakewell, Inc. v. Kroeger*, 617 S.W.2d 447, 451 (Mo.App. 1981). Despite their promises of diligence, by the end of the second year, the Johnsons' efforts to obtain financing consisted of asking Edgar Gregg to act as lender and inquiring about, but not applying for, a loan at People's Bank of Clever, located two blocks from the property they sought to purchase. Thus there was ample evidence that the Johnsons were not diligent in their attempts to obtain financing before the end of the two-year period, a point the Johnsons concede in their brief.

Notwithstanding the Johnsons' lack of diligence in seeking financing prior to the end of October 1989, Edgar Gregg allowed them additional time to arrange financing. Moreover, Gregg admitted it was not until his telephone conversation with Hugh Merritt that he no longer considered himself obligated to sell the property to the Johnsons. As a result, we must decide when, and for what reason, was Gregg justified in terminating the contract.

 As a general rule, in ordinary contracts for the sale of real estate, equity does not regard time as of the essence of the agreement. *Wimer v. Wagner*, 323 Mo. 1156, 20 S.W.2d 650, 652 (1929). Nevertheless, the parties may make time an essential element by express stipulation in the agreement. *Cochran v. Grebe*, 578 S.W.2d 351, 353 (Mo.App.1979). Where a contract does not expressly provide that time is of the essence, courts look to the language and purpose of the contract and to all the surrounding circumstances to determine whether the parties intended that time be of the essence. *Id.* at 353–54. Such intention must be "clearly manifested." *Wimer*, 20 S.W.2d at 652. Although the parties to the contract under consideration did not expressly state that time was to be of the essence, our reading of various portions of the contract and the testimony of James Johnson and Edgar Gregg indicates a clear intention on the part of the parties that timely performance by the Johnsons was to be essential.

 Nevertheless, strict performance of a time limitation in a contract for the sale of real estate may be waived, orally or in writing, by the party entitled to insist on it. *Rayburn v. Atkinson*, 206 S.W.2d 512, 516 (Mo.1947). Time requirements that have been waived may be made essential thereafter "when and only when the vendor makes it so by proper notice insisting on performance within some reasonable time." *Id.* The "proper notice" must be "reasonable." *Three–O–Three Inv. Inc. v. Moffitt*, 622 S.W.2d 736, 742 (Mo.App.1981). What constitutes a "reasonable time" depends on the circumstances of each case. *Id.* at 741. Furthermore, even if parties to a real estate sale contract do not, at the outset, consider time to be of the essence, the vendor, by demand

for prompt performance and by providing notice of the consequences of failure of timely performance, may make time of the essence. *Cochran,* 578 S.W.2d at 354.

■ There was evidence from which the trial court could have concluded that, during the various telephone conversations in November and early December 1989, Edgar Gregg, although permitting the Johnsons additional time to secure financing, insisted on prompt performance and advised James Johnson of the consequences of a failure to obtain a loan commitment. The fact that after the initial two-week extension Gregg never specified a date by which the Johnsons must have received a loan commitment does not defeat his right to declare the contract at an end. For if no time had been fixed, the law, nevertheless, would require performance within a reasonable time. *Three-O-Three Inv. Inc.,* 622 S.W.2d at 741. Evidence concerning the Johnsons' attempts, over a period of more than 25 months, to obtain financing, coupled with testimony about Edgar Gregg and James Johnson's conversations, was sufficient to permit the trial court to conclude that the outer limit of "a reasonable time" was reached on December 7, 1989.

Having determined that the trial court could have found that December 7 was a reasonable date by which the Johnsons should have secured loan approval and commitment, we now turn to the question of whether there existed a loan commitment. Although the contract did not specify the form a loan commitment should take, we believe the commitment should have been reasonable under the circumstances in order to require the Greggs, under the terms of paragraph 12 of the contract, to proceed toward closing the transaction with the Johnsons. Evidence about a loan commitment came from the testimony of three persons: James Johnson, Hugh Merritt, and Edgar Gregg. Apparently, the trial court found there was no loan commitment. *See American Repub-*

*lic Ins. Co.,* 799 S.W.2d at 190. Given the deference we accord the trial court's ability to evaluate the testimony about the Johnsons' efforts to obtain financing and Edgar Gregg's conversations with James Johnson and Hugh Merritt concerning financing, we find no error.

Concerning the Johnsons' assertion that the Greggs "declared a forfeiture" without warning, we note there was evidence that Gregg had advised Johnson, as early as October 1989, that he would sell the property to someone else if the Johnsons did not promptly obtain the necessary financing to close the transaction. Thus the Johnsons were not without warning. Moreover, the Johnsons explicitly agreed that if they did not "perform" by the end of the respective 12-month periods, all their payments would be non-refundable as rent, and they struck from the standard form sale contract language that might have permitted refund of at least a portion of a "deposit" upon failure of the financing contingency. The retention by the Greggs of money paid them by the Johnsons pursuant to the contract is permitted by the law. *See Burst v. R.W. Beal & Co.,* 771 S.W.2d 87, 91[4] (Mo.App. 1989).

■ The Johnsons cite us to several cases that stand for the general proposition that equity abhors a forfeiture.[3] The facts of those cases differ considerably from the facts before us. There was evidence at trial that the rental value of the property was equal to or greater than the amount the Johnsons paid.[4] Thus the trial court could have found there was no impermissible penalty wrought by the Greggs' retention of all payments made by the Johnsons. *See Long v. Smith,* 776 S.W.2d 409, 415 (Mo.App.1989).

Under the standard of review mandated by *Murphy v. Carron,* 536 S.W.2d at 32, we conclude there was substantial evidence

---

3. *Beck v. Strong,* 572 S.W.2d 484 (Mo.App.1978); *Joplin CMI, Inc. v. Spike's Tool and Die,* 719 S.W.2d 930 (Mo.App.1986); *Plymouth Securities Co. v. Johnson,* 335 S.W.2d 142 (Mo.1960).

4. Edgar Gregg testified the rental value of the house was $250 a month and the shop, $500 a month. Rickey Wolfe testified the combined rental value of the house and shop was $650 a month.

on all dispositive issues to support the trial court's judgment.

Judgment affirmed.

FLANIGAN, C.J., and PARRISH, P.J., concur.