**Elmer TRAPP and Marie Trapp, Plaintiffs–Appellants,**

**v.**

**Dennis L. BARLEY and Cheryl L. Barley and Darrell L. Barley and Marjorie M. Barley, Defendants–Respondents.**

No. 19280.

Missouri Court of Appeals, Southern District, Division One.

April 6, 1995.

Robert P. Warden, Joplin, for plaintiffs-appellants.

Stephen P. Carlton, Carthage, for defendants-respondents.

SHRUM, Chief Judge.

Elmer and Marie Anne Trapp (Plaintiffs) sued Dennis L. and Cheryl L. Barley, his wife, and Darrell L. and Marjorie M. Barley, his wife (Defendants), for return of an earnest money payment made by Plaintiffs as part of a real estate sales contract.[1] Plaintiffs claim that the contract was "impliedly contingent" upon the sale of their Chicago home as that was necessary for them to qualify for financing. Therefore, Plaintiffs argue that the payment was refundable when they failed to sell their Chicago home and receive financing. Plaintiffs also sued for return of money they paid for additional fixtures and improvements to the home made at their request.

Defendants rely on a liquidated damages clause in the contract to claim that the earnest money payment was nonrefundable. They also counterclaimed for an alleged balance due for requested modifications and additions to the home.

Following a bench trial, the trial court found against Plaintiffs on their claims and on Defendants' counterclaim. Plaintiffs appeal; we affirm.

### FACTS

On December 29, 1989, Plaintiffs entered into a contract to purchase a home at 119 Hidden Valley, Joplin, Missouri, from Defendants. Construction of the home was underway but incomplete when the contract was signed. Defendant Darrell Barley was the builder.

The contract was on a standard real estate sales form, which stated it was approved by

---

1. Without intending disrespect, when we refer in this opinion to Elmer and Marie Trapp individually, we use their first names. Collectively, we refer to them as "Plaintiffs." Similarly, when we refer to the Barleys individually, we use their first names. Collectively, we refer to them as "Defendants."

the Joplin Board of Realtors. Carol McDaniel was the real estate broker who handled the sale and prepared the contract.[2]

The basic contract terms were as follows: The home under construction at 119 Hidden Valley, Joplin, Missouri, was to be purchased by Plaintiffs for $225,000. Plaintiffs were to make an earnest money payment totaling $22,500 (10 percent of "total sales price") in two installments—$11,000 at the signing of the contract, and $11,500 paid five business days later. Within fourteen days after the entire earnest money payment was made (presumably to McDaniel, although this is unclear), it was to be paid "to builder as a part of the purchase price." Closing was to be on or before April 30, 1990.

The contract form contains a preprinted clause regarding "total sales price," down payment, financing, and obtaining a loan. However, the terms pertaining to a loan or financing were left blank as shown by the following:

"The total sales price for said property shall be *$225,000.00;* to be paid as follows:

(a) $ 11,000    in the form of (cash) check to be deposited with the Listing Broker as an EARNEST MONEY DEPOSIT on acceptance of this contract, and applied as a part of purchase price. *See special agreemt # 4.*[3]

(b) $_____    by buyer ASSUMING THE EXISTING LOAN, adjusted to reflect exact loan balance at closing with initial interest not to exceed ____% per annum.

(c) $_____    subject to Buyer's ability to obtain a _____ loan, or loans in the amount of $_____, payable over a period of ____ years, bearing initial interest at the rate of ____% per annum and secured by a _____ deed of trust in a form approved by lender. Seller shall not be obligated to pay any of Buyer's expenses incidental to the obtaining of any loan. Buyer shall use reasonable diligence in seeking to obtain such loans.

(d) $_____    by SELLER CARRYING A LOAN at ____% per annum, payable: _____ and secured by a _____ deed of trust.

(e) $202,500    BALANCE BY CASHIER'S CHECK ON CLOSING plus closing costs."

---

The contract form next contains a preprinted contingency clause.

"CONTINGENCIES: This contract is contingent upon the above financing being committed on or before *15 April 1990.* It is mutually understood that this time limit is a maximum time limit and that in the event the buyer is unable to obtain such loan, the seller shall have the right forthwith to declare this contract null and void and earnest money deposited shall be returned to buyer, less any expenses that have been incurred in the process of obtaining such a loan."[4] (Emphasis ours.)

On the back side of the contract form is a liquidated damages clause.

"If this contract is not closed because of the fault of Buyer, then 10% of the total sales price shall be paid by the Buyer to the Seller as liquidated damages.... If this contract shall not be closed because of the Seller, then buyer shall be entitled to pursue legal remedies available to him,

---

**2.** In Count III, Plaintiffs sued McDaniel charging that she had a duty to prepare a sales contract that accurately reflected the agreement of the parties, that she breached that duty, and Plaintiffs were thereby damaged. The trial court entered judgment for McDaniel on Count III. Plaintiffs do not appeal from that judgment.

**3.** "[S]pecial agreemt # 4" reads: "4) Total earnest money shall be $22,500 to be paid as follows; $11,000 at signing of contract, $11,500 within 5 business days later. Within 14 days of the receipt of all earnest money $21,500 shall be paid to builder as a part of the purchase price."

**4.** The underscored "15 April 1990" was not part of the preprinted form.

including suit for damages or for specific performance of this contract."

The testimony of Carol McDaniel provides background regarding the contract and its preparation. When McDaniel first began showing houses to Plaintiffs, Marie talked repeatedly about features of her town house in Chicago which she wanted in her Joplin home. Because the desired features were not ordinarily in custom built homes in Joplin, McDaniel focused on showing Plaintiffs houses under construction.

Before the contract was signed, McDaniel discussed financial arrangements with Plaintiffs, including the fact that if they were "interested in having a customized home that would be fixed to [Marie's] specifications . . . it would have to be a cash transaction. We could not have a contingency, in other words." Additionally, McDaniel told Plaintiffs that "there was not a builder in the Joplin area that would customize a house to their specifications with all the changes that Marie was talking about making, if it were contingent upon the closing of their town house [in Chicago]."

McDaniel showed Plaintiffs the subject house as it was in an early stage of construction thus allowing changes, as suggested by Marie, to be made. At the initial showing, Plaintiffs talked with Darrell about proposed changes. At the second meeting, when contract terms were discussed, Darrell told Plaintiffs and McDaniel that "he needed ten percent for earnest money. And because these changes were to be immediately started . . . that he wanted the majority of it released to him so that he could make these changes." Plaintiffs agreed to Darrell's proposal regarding earnest money.

After the second meeting, McDaniel filled in a contract form "in either pencil or ink and then hand[ed] it to a secretary who typed it." She then met with Plaintiffs where she spent approximately an hour going over and reviewing the contract. After reviewing the contract, Plaintiffs had no questions and

signed it. McDaniel testified she did not know how "April 15th, 1990 came to be filled in under the contingency paragraph" and in fact never noticed it until January or February 1991. She "always thought it was [a mistake] because [she did not] know how otherwise it would have gotten on there."

Continuing, McDaniel testified that "problems" developed before the April 30, 1990, closing date. First, Marie delayed in making decisions about changes in construction which prevented Darrell from finishing the house. Second, sometime between April 1 and April 15, 1990, Plaintiffs first told McDaniel they could not raise the money to close unless they sold their Chicago property.[5] When it became clear that closing would not happen by April 30, 1990, the parties signed an extension agreement in late April 1990 that set a new closing date of May 15, 1990. This document also described some of the construction changes already completed, what the additional charges were, and recited the amount due from Plaintiffs for the changes after credit for payment. The final paragraph reads: "The herein agreement . . . is herewith made an integral part of the [December 29, 1989,] Agreement of Sale [relating to 119 Hidden Valley, Joplin, Missouri]."

When the sale did not close in May as agreed, another extension agreement was signed in June 1990. In part, it contained this preprinted language:

"All of the terms and conditions set out in the attached Real Estate Sale Contract between the above-named Buyer and Seller are acceptable to the Buyer and Seller with the following changes or additions . . . ."

The parties typed in the following as the changes or additions:

"1. Closing is hereby extended to on or before August 1, 1990.

2. Buyers agree to reimburse Sellers for any interest paid on $120,000.00 of a construction loan from May 15, 1990[,]

---

5. Darrell likewise testified that it was after contract signing when Plaintiffs first said they had to sell their Chicago real estate as a prerequisite to closing the Joplin contract. Plaintiffs testified otherwise, saying that when they first met

McDaniel, they told her they had to sell their Chicago property in order to buy in Joplin. The trial court resolved this factual dispute adversely to Plaintiffs.

to the date of closing, payable in full at day of closing."

Three more extension agreements containing the same preprinted language were signed without the sale being closed. An August 1990 extension addendum extended closing to October 1, 1990. It also obligated Plaintiffs to pay two months' interest on the construction loan by August 14, 1990, with the balance at closing, and required Plaintiffs to provide a financial statement. A fourth addendum agreement signed by Defendants in early October 1990 extended closing to October 15, 1990, and required Plaintiffs to pay $550 on construction loan interest if the sale was not closed by October 15. The last extension agreement signed in early December 1990 extended closing to January 15, 1991.

Finally, in February 1991, Defendants notified Plaintiffs that they could no longer carry the construction loan and keep the house off the market. They declared the contract null and void because of Plaintiffs' failure to close by the last date set (January 15, 1991) and demanded that Plaintiffs pay for "changes made pursuant to the contract." That prompted Plaintiffs' request for return of the earnest money. When Defendants refused, this suit followed.

At trial, Elmer testified he had interpreted the "15 April 1990" contingency to mean that he "had to obtain financing by April 15th, 1990," and if he were unable to do so, he would get his earnest money back. Plaintiffs both admitted, however, that they never tried to obtain a loan to pay off the Joplin house. Elmer explained that he "thought it would have been stupid" to seek additional financing because payments on two places, i.e., the Chicago town house and the Joplin property, would have required 77 percent of his monthly income. Elmer also admitted that in November or December 1990, Defendants and McDaniel asked permission to show the Joplin house to a prospective purchaser, but Plaintiffs refused.

As to Plaintiffs' efforts to sell the Chicago real estate, Elmer testified they first listed it for $390,000. An offer of $305,000 was refused in August or September 1990. When, in December 1990, their property remained unsold, Plaintiffs made improvements on it and relisted it for sale at $425,000. They finally sold the Chicago property in November 1993 for $355,000.

The trial court found that the agent, Carol McDaniel, made a mistake in filling "15 April, 1990" into the contingency clause. It also found that the "conduct of the parties ... makes it clear that the parties considered the earnest money deposit to be nonrefundable."

"The Court finds that the plaintiffs' actions in requesting that the contract be extended, that they requested modifications and alterations, the purchase of specific plumbing fixtures which were incorporated into the residence, the plaintiffs['] willingness to pay the defendant's [sic] construction loan interest, exercising control over the construction of the residence, and prohibiting defendants from offering the residence for sale to others are all acts inconsistent with plaintiffs['] allegation that the contract is contingent upon their obtaining financing."

As to Defendants' counterclaim, the trial court further found:

"[Defendants] are entitled to the total sum of ... ($9,810.00), representing the amounts due for alterations and modifications requested by plaintiffs....

The Court further finds that Defendants Barley eventually sold the real estate and residence for the sum of ... ($203,000.00) ... [and] that Defendant Barleys are entitled to no additional funds on the loss of this sale [because] the liquidated damage clause of the original contract sets forth the amount Barleys are entitled to in the event of plaintiff's [sic] default."

The trial court entered judgment in accordance with its findings. Plaintiffs appeal from that judgment.

## STANDARD AND SCOPE OF REVIEW

Our role in reviewing a court-tried case under the standards of Supreme Court Rule 73.01(c) and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), is clear. The "judgment of the trial court will be sustained by the appellate court unless there is no substantial

evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32[1].

■ The phrase "weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. *Johnson v. Gregg,* 807 S.W.2d 680, 685[1] (Mo.App.1991). "The weight of the evidence is not determined by mathematics; it depends on its effect in inducing belief." *Id.*

■ On appeal of a court-tried case, appellate courts give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Estate of Moore,* 802 S.W.2d 192, 194[2] (Mo.App.1991). The trial judge as trier of fact may disbelieve testimony even if it is uncontradicted. *Johnson,* 807 S.W.2d at 685[3]. In a court-tried case, we are to sustain the trial court's judgment if the result was correct on any tenable basis. *Id.* at 685[5].

## DISCUSSION AND DECISION

*Sale of Chicago Property as an Implied Contingency*

In their first point, Plaintiffs make the following contention:

"The trial court erred in finding that there was no contingency in the contract and, thus, the liquidated damages clause was applicable and allowed [Defendants] to retain the earnest money deposit because it was against the weight of the evidence in that [Defendants] knew, prior to signing five addendums to extend the closing of the contract, that the purchase of the Barley house was, in fact, contingent upon the sale of [Plaintiffs'] townhouse [sic] in Illinois and, thus, impliedly consented to said contingency."

Plaintiffs concede that the trial court resolved adversely to them the factual issue as to whether Defendants knew when they signed the original contract that Plaintiffs had to sell their Chicago property before they could close on the Joplin real estate. Nonetheless, Plaintiffs argue that their declared need to sell their Chicago property as a condition to buying the Joplin real estate was known by Defendants each time an extension agreement was signed. They insist, therefore, that "[t]he sale of their condo in Chicago was a condition subsequent to which all the parties prior to and through the execution of five successive addendums agreed to be bound by." Plaintiffs summarize their argument as follows:

"Even if the Court accepts that [Defendants] believed this was a 'cash deal', with no contingency, at the time of the signing of the first contract, they certainly were aware that the purchase of their property was, in fact, contingent upon the sale of [Plaintiffs'] property in Chicago prior to and throughout the signing of the addendum. Their subsequent actions reflect their implied agreement that the type of financing referred to, but not specifically set out in the Contract, is, in fact, the sale of [Plaintiffs'] property and, further, produced an implied consent to the terms of the contract as understood by [Plaintiffs]."

Our supreme court has stated the following as principles to be applied when considering whether contract provisions are to be created by implication:

"'[I]n order that an unexpressed [contract] term may be implied, the implication must arise from the language employed in the instrument or be indispensable to effectuate the intention of the parties; * * *. Accordingly, there can be no implication as against the express terms of the contract; and the courts will be careful not to imply a term, * * * as to which the contract is intentionally silent, * * *.'"

*Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo. 1969) (quoting 17A C.J.S. *Contracts* § 328, pp. 287–91). Additional rules of law that govern are stated in *Conservative Federal Savings & Loan Ass'n v. Warnecke,* 324 S.W.2d 471 (Mo.App.1959).

"It is a general rule of law that when parties reduce their agreements to writing it is presumed that the instrument contains their entire contract, and the court will not read into it additional provisions unless this be necessary to effectuate the intention of the parties as disclosed by the contract as a whole. Implied obligations must rest entirely upon the presumed in-

tention of the parties, as gathered from the terms actually expressed in the writing itself; and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto, or it must appear that it is necessary to infer such an obligation to effectuate the full purpose of the contract. It is not enough to say that the implied covenant is necessary to make the agreement fair, or that without such covenant it would be improvident or unwise, or that the contract will operate unjustly.... No implied provision can be inserted ... to supply a covenant upon which it was intentionally silent...."

*Id.* at 478–79[1–4]. *See also Henderson v. Brown Electrical Supply Co.,* 555 S.W.2d 635, 639[9] (Mo.App.1977).

■ Keeping in mind the above rules, we find nothing in the language used in the five extension agreements, either singularly or collectively, that compels the implication of the contract contingency term urged by Plaintiffs. It is clear that the principal purpose of these documents was to extend the time for closing. To effectuate that intention it is not necessary to infer an implied obligation that Defendants return to Plaintiffs the earnest money if Plaintiffs failed to sell other property.

Nor do we find from the evidence that the contingency suggested by Plaintiffs must be implied to "effectuate the intention of the parties," *see Glass,* 444 S.W.2d at 478, or that it was "so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate with reference thereto." *Conservative Federal,* 324 S.W.2d at 478[2]. To the contrary, there is ample evidence that the parties *never* contemplated contingencies to be a part of this sales contract, either originally or as extended. Thus, in July or August 1990, when Elmer asked Darrell "about maybe ... giving him his money back," Darrell answered that he "had no intention of giving it back." Asked if he told Elmer why, Darrell answered, "We were given that money to work with ... as a down payment. There were no contingencies in this contract."

As to the extension agreements, Darrell testified that in signing them he never considered "it to be a contingency that [Plaintiffs] had to sell their house in Chicago to buy [Defendants'] house." Additionally, Carol McDaniel's testimony about her meeting with Elmer in September 1990 as they discussed the third extension agreement, demonstrates that Plaintiffs entered into the original agreement and the extensions without misconception.

"Q. (To McDaniel) Was there any conversation with [Elmer] about whether or not he could get his earnest money deposit back?

A. He had been very disappointed, he said that [Darrell] had told him at that time that he was not going to get his earnest money back. *He realized he couldn't get it. He was not supposed to get it back,* but he was hoping they had a gentlemen's agreement that [Darrell] would allow him to get it back." (Emphasis ours.)

Based upon this record, we know of no principle upon which it can be said that the trial court erred when it failed to read into this contract the contingency urged by Plaintiffs. Plaintiffs' arguments to the contrary are rejected. *See Glass,* 444 S.W.2d 467; *Conservative Federal,* 324 S.W.2d 471. Point I denied.

*Award of Liquidated and Actual Damages*

In their third point, Plaintiffs say the trial court erred in awarding both liquidated and actual damages. They contend that because the contract provides for liquidated damages, such clause controls; therefore, actual damages are not recoverable and recovery is instead limited to the stipulated sum, i.e., $22,500. To support their argument, they cite and rely on *Warstler v. Cibrian,* 859 S.W.2d 162 (Mo.App.1993), and *Germany v. Nelson,* 677 S.W.2d 386 (Mo.App.1984). These cases state the rule that "[l]iquidated and actual damages generally may not be awarded as compensation for the same injury." *Warstler,* 859 S.W.2d at 165[8] (citing *Germany,* 677 S.W.2d at 388[4] ). *See also Arnett v. Keith,* 582 S.W.2d 363 (Mo.App. 1979). This rule of law has developed in

order to protect against the wrong of duplicating damages. *Twin River Construction Co., Inc. v. Public Water District No. 6,* 653 S.W.2d 682, 694 (Mo.App.1983).

In response, Defendants argue that this case is distinguishable from *Warstler, Germany,* and *Arnett,* because they have suffered separate and distinct injuries for which they are entitled to two types of damages, that is, (1) liquidated damages for loss of profit on the house and lot and, (2) actual damages related to nonpayment for extras requested by Plaintiffs. Defendants cite and rely on *Bloomfield Reorganized School District No. R–14 v. Stites,* 336 S.W.2d 95, 100 (Mo.1960), and *Twin River,* 653 S.W.2d at 694, cases in which our supreme court and the eastern district allowed set-offs of *both* actual and liquidated damages against the amounts due under construction contracts.

■ We find Defendants' argument and authority persuasive. The contract before us can reasonably be read to authorize both types of damages—actual damages related to the cost of extras and liquidated damages to compensate for Plaintiffs' failure to close. *See Twin River,* 653 S.W.2d at 694. This follows because the contract imposed on Plaintiffs' separate and distinct commitments regarding payment. Plaintiffs agreed to (1) pay "extra cost" for any "alteration or deviation from agreed upon specifications ... at the time the construction cost is incurred," and (2) pay the balance of the "total sales price" at closing. As to damages for breach of those obligations, the liquidated damage clause is restricted solely to damages for Plaintiffs' failure to close. Specifically, the liquidated damages clause says that if the contract is not closed because of Buyer's fault, "then 10 [percent] of the *total sales price* shall be paid by the Buyer to the Seller." The *total sales price* of $225,000 is payment for the "property" and does not include payment for extras. Had Plaintiffs closed but refused to pay for extras, Defendants could not have invoked the liquidated damages clause for redress. Instead, Defendants' remedy is to prove actual damages for nonpayment of extra construction costs.

We conclude that Defendants suffered distinct injuries from Plaintiffs' separate breaches of the contract. Because Defendants' liquidated damages and "extra construction cost" damages remedied different injuries, they were not duplicative. *See Palmco Corp. v. American Airlines, Inc.,* 983 F.2d 681 (5th Cir.1993); *Construction Contracting & Management, Inc. v. McConnell,* 112 N.M. 371, 377, 815 P.2d 1161, 1167 (1991); *Louis Lyster General Contractor, Inc. v. City of Las Vegas,* 83 N.M. 138, 146, 489 P.2d 646, 654 (1971). Therefore, the trial court did not err in awarding both liquidated and actual damages to Defendants. *Bloomfield Reorganized School District,* 336 S.W.2d at 100; *Twin River,* 653 S.W.2d at 694. Point denied.

*Lack of Compliance With Rule 84.04(d)*

We reproduce verbatim Plaintiffs' second point relied on:

"The trial court erred in not finding that the respondents Barley repudiated and rescinded the contract, plaintiffs' exhibit No. 1, and all amendments thereto, thus rendering it null and void, and by not restoring the parties to their original respective positions prior to signing the contract, plaintiff's [sic] exhibit 1."

Rule 84.04(d), governing an appellant's points relied on, provides, in pertinent part:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous, with citations of authorities thereunder....

Setting out only abstract statements of law without showing how they are related to any action or ruling of the trial court is not a compliance with this Rule."

In *Jones v. Wolff,* 887 S.W.2d 806 (Mo.App. 1994), the court explained the Rule 84.04(d) briefing requirement.

"The three components of a point relied on are: a concise statement of the challenged ruling of the trial court; the rule of law the court should have applied; and the evidentiary basis upon which the asserted rule is applicable. Points which do not state what ruling of the trial court is challenged nor provide a proper evidentiary

basis, but instead set out abstract statements of law, preserve nothing for appeal." *Id.* at 808[6, 7] (citation omitted).

■ Points relied on that do not meet the requirements of Rule 84.04(d) preserve nothing for review. *Thummel v. King,* 570 S.W.2d 679, 684 (1978). Moreover, "allegations of error ... not properly briefed shall not be considered in any civil appeal...." Rule 84.13(a).

■ Point II fulfills neither the *why* nor the *wherein* requirements of Rule 84.04(d). We are unable to discern a rule of law Plaintiffs believe the trial court should have applied and the point does not identify any evidence that would give rise to the ruling that Plaintiffs contend the trial court should have made. *See State ex rel. Marshall v. Hercey,* 869 S.W.2d 878, 882 (Mo.App.1994). Such a point preserves nothing for our review. *Id.*

We decline the discretionary authority granted us by Rule 84.13(c) to examine the argument portion of Plaintiffs' brief or the record on appeal in search of plain error. Point denied.

The judgment of the trial court is affirmed.

FLANIGAN and MONTGOMERY, JJ., concur.